[Civ. No. 42560. Second Dist., Div. Four. Oct. 28, 1974.]

PLAN FOR ARCADIA, INC., et al., Plaintiffs and Appellants, v. CITY COUNCIL OF ARCADIA, Defendant and Respondent; ANITA ASSOCIATES et al., Real Parties in Interest and Respondents.

714

## Counsel

Young, Henrie & McCarthy, John C. McCarthy, Timothy P. Burrell and Stephan C. Volker for Plaintiffs and Appellants.

No appearance for Defendant and Respondent.

O'Melveny & Myers, Philip F. Westbrook, Jr., Richard S. Volpert, Thomas H. Childers, Francis J. Burgweger, Jr., James W. Colbert III and Barrett, Stearns Collins, Gleason & Kinney for Real Parties in Interest and Respondents.

## Opinion

**COLE, J.**\*—Plan for Arcadia, Inc., and Carl J. Williams (hereinafter "petitioners") unsuccessfully sought a writ of mandamus directed to the City Council of the City of Arcadia (hereinafter "City Council"). Anita Associates, a limited partnership, and Santa Anita Consolidated, Inc., a corporation, were named as real parties in interest (hereinafter "Santa Anita" collectively and "Anita Associates" or "Consolidated" when referred to separately). Petitioners appeal.

The questions raised on this appeal involve the Environmental Quality Act of 1970 (hereinafter "E.Q.A.") Public Resources Code sections 21000-21174.[1] Specifically, petitioners complain with respect to three projects approved or undertaken by the City Council:

---

\*Assigned by the Chairman of the Judicial Council.

[1]All statutory references are to the Public Resources Code unless otherwise noted.

(1) Anita Associates' development of a major regional shopping center (Fashion Park) located on 72 acres of Consolidated's 400 acres of property in Arcadia;

(2) The building of a new parking lot on property owned by Consolidated.

It is contended by petitioners that the city failed to file a proper environmental impact report (hereinafter "E.I.R.") in connection with these matters.

(3) The widening of the northern portion of Baldwin Avenue, an artery located to the west of the Consolidated property and of Fashion Park.

We hold, in summary, that projects (1) and (2) are not covered by the E.Q.A. and that while project (3) is covered the court's conclusion that there was substantial evidence to support the City Council's determination that the project would have no significant effect on the environment is itself supported.

## THE ENVIRONMENTAL QUALITY ACT

An understanding of the issues raised on this appeal requires an examination of the provisions of the E.Q.A. "As the express legislative intent forthrightly declares, the EQA was designed to be a milestone in the campaign for 'maintenance of a quality environment for the people of this state now and in the future . . . .' (§ 21000, subd. (a).) . . ." (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 252 [104 Cal.Rptr. 761, 502 P.2d 1049]). The preamble of the Act ". . . contains a broad expression of legislative policy and recognition that the maintenance of a quality environment, present and prospective, 'is a matter of statewide concern'; that '[i]t is necessary to provide a high-quality environment that at all times is healthful and pleasing . . .'; that '[t]he capacity of the environment is limited . . .'; and it is the legislative intent and policy to 'take immediate steps to identify any critical thresholds for the health and safety of the people . . .,' to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state,' and to '[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions.' To that end the Act adopted a comprehensive plan requiring, among other things, that state and local agencies follow a broad program of governmental action designed to assure that in both the planning and construction phases of 'man's activities' primary consideration be given to the effect of such activities on man's environment. In *Mammoth* these requirements were construed to cover the private sector as well. Among CEQA's requirements are those

contained in Public Resources Code section 21151, providing that 'All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment.' Such a report is required to contain a detailed description of any adverse environmental impact and effect of the proposed action, together with any alternative and minimum options available. (§ 21100.)" *(County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, at pp. 802-803 [108 Cal.Rptr. 377].)

*Mammoth* was decided on September 21, 1972. In response to *Mammoth* the E.Q.A. was extensively amended by urgency legislation, effective December 5, 1972 (Stats. 1972, ch. 1154).

As amended, the E.Q.A. applies ". . . to discretionary projects proposed to be carried out or approved by public agencies . . ." (§ 21080, subd. (a)). It does not apply to ministerial projects proposed to be carried out or approved by public agencies (§ 21080, subd. (b)).

Under the terms of the act "project" means, insofar as relevant here, "activities directly undertaken by any public agency" (§ 21065, subd. (a)) and "activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies" (§ 21065, subd. (c)). The latter subdivision makes explicit the holding in *Mammoth* that the E.Q.A. applies to private projects requiring governmental approval as well as to projects directly undertaken by the agencies themselves.

The 1972 amendments to the E.Q.A. contain a validation provision. Section 21169 states that any private party project (§ 21065, subd. (c)) ". . . undertaken, carried out, or approved on or before the effective date of [the amendments (Dec. 5, 1972)] and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before [that date] notwithstanding a failure to comply with [the E.Q.A.], if otherwise legal and valid, is hereby confirmed, validated and declared legally effective."

The 1972 amendments also included a moratorium with respect to private projects. Section 21171 provides that except for section 21169 (validating prior projects) the act should not apply until the 121st day after the effective date of section 21171 (The 121st day was Apr. 5, 1973). The same section states that it "shall not prohibit or prevent a public agency, prior to the 121st day . . . from considering environmental factors in connection with the approval or disapproval of a project . . . ."

From this brief tour through relevant provisions of the E.Q.A. we turn to a discussion of the facts.

## FACTS

(1) *Fashion Park:* In April 1970, Consolidated applied for a zoning change on 72 acres of its property in order to construct Fashion Park. Numerous hearings were held by the Arcadia Planning Commission and the City Council. The council enacted a resolution submitting the zoning change question to the voters of Arcadia. The voters approved the zoning change at the election of April 20, 1971, the change becoming effective May 28, 1971.

In the material submitted to the voters, the zoning change was specifically described as being intended to permit the development of a regional shopping center. The ordinance adopted by the voters contains findings. Among other things, it states that the unique size and location of the property make it suitable for such shopping center and that the public convenience, general welfare and good zoning procedure justify the re-zoning. The voters' "findings" also describe the location of the property, its relationship to single family residential areas, states that it is well served by major highways and has convenient access to the Foothill Freeway and states that economic surveys show a need for the center.

The ordinance also provides that the development for use of the property should be regulated and controlled by the conditions of City Council resolution No. 4185 and that the resolution should become effective on the effective date of the ordinance. That resolution was included in the voters' pamphlet and set forth 21 conditions relating to the construction of the shopping center.[2]

---

[2]Pertinent conditions include the following: Condition 2 provides that "The buildings shall be constructed within the areas shown on the Design Overlay Site Plan which is attached . . ." That document is a plot plan of the property. A solid line placed thereon designates the perimeter of the "Building Envelope" within which "all shopping center buildings consisting of department stores, tenant shops, and enclosed air conditioned mail are located." It was specifically provided that the building location may be varied within this boundary and in fact the buildings as sketched on the Design Overlay Site Plan showed that *three* department stores and other stores would be located within the "building envelope." However, as ultimately approved by the City Council, Fashion Park included *four* department stores constructed to a configuration different from the building outline set forth in the Design Overlay Site Plan, but still within the perimeter of the "building envelope."

Condition 3 of resolution No. 4185 states: "Preliminary plans shall be submitted to and shall be subject to approval by the Arcadia City Council. The final plans shall comply substantially with the preliminary plans and shall be submitted to and shall be subject to the approval by the City Council." Condition 7 provided that: "Any use of the property which is subject to the Conditional Use Permit provisions of the Zoning

Also included in the voters' pamphlet were arguments in favor of and against the ordinance. The argument in favor did not expressly address itself to environmental considerations, as opposed to economic considerations. The argument against claimed that Fashion Park would aggravate the existing air pollution and among other things stated that:

"YOUR VOTE on this matter will determine Arcadia's future. A No vote will preserve our city as a fine residential community rather than begin a change to a high density urban center of commercial activity.

"A regional shopping center is totally incompatible with racetrack activity. The center's projected traffic of 20,000 cars daily is nearly *twice* that which the racetrack experiences on the average racing day. This would aggravate an already hazardous air pollution problem and jeopardize the safety of our children. No traffic plan can adequately permit 20,000 automobiles to enter the shopping center daily during racing season.

"The proposed development, eliminating the training track and 650 horse stalls, would inevitably displace racing in the near future, causing revenue loss to Arcadia.

"Re-development of the entire 400 acres, as shown on the Illustrative Site Plan prepared by the developer's architect, would include high density uses for the balance of the track property, including hotels, high-rise apartments and further commercial developments."

On November 24, 1970, an opponent of the proposed zoning change submitted to the City Council a Site Plan covering the entire 400 acres occupied by Santa Anita Race Track and owned by Consolidated suggesting that Consolidated intended to develop the entire property "into a Century City type complex" going way beyond the shopping center.

On April 6, 1972, Consolidated leased to Anita Associates the 72 acres of the Fashion Park site. Anita Associates' preliminary plans for the center were thereafter submitted to the City Council and it approved those preliminary plans on August 15, 1972.

At meetings held in November and December of 1972 the City Council considered and approved the traffic report for Fashion Park and the southerly part of Baldwin Avenue. On December 5, 1972, the City Council accepted Consolidated's offer to dedicate a 20-foot strip of Baldwin Avenue

Ordinance shall require a conditional use permit." Condition 9 required Consolidated to dedicate a 20-foot strip of Baldwin Avenue to the City. Condition 21 provided that: "The City Council may add to, amend or modify the conditions of this resolution in a manner not inconsistent with the concept and substance of this resolution, provided that the building envelope shown on the Design Overlay Site Plan shall not be altered."

to the City. In February 1973, Anita Associates applied for a grading permit for Fashion Park site. The director of public works of Arcadia requested Anita Associates to provide the city with data from which an E.I.R. could be prepared for Fashion Park. Anita Associates believed that no such report was necessary a's did the city attorney but voluntarily submitted such a report. Ultimately, after hearings by the planning commission, a draft E.I.R. was accepted by it and eventually an E.I.R. was approved by the City Council after public hearings. The evidence before the City Council included the draft E.I.R. and testimony and written statements by interested persons. The council approved the E.I.R. on March 20, 1973. The next day the grading permit for Fashion Park was issued.

The petition below was filed on May 1, 1973, and the court's oral announcement of its intended decision after trial was rendered on May 23, 1973. The judgment was entered July 17, 1973. On June 5, 1973, the City Council held public hearings on the final plans submitted by Anita Associates and voted to approve the project subject to reconsideration. When petitioners thereafter tried to file a supplemental petition referring to the final approval the trial court denied the motion.

### BALDWIN AVENUE WIDENING

In the 1960s traffic projections indicated that with the completion of the Foothill Freeway, Baldwin Avenue would receive a traffic volume substantially greater than it could safely accommodate and the city concluded that the eventual improvement of the Avenue was necessary. When the Fashion Park applications were under consideration the city determined that additional traffic generated by the shopping center could be accommodated by the widening already requested because of the freeway. In order to save the city a portion of the cost of widening, however, Anita Associates was required to commit itself to pay for widening of that portion of Baldwin Avenue adjacent to Fashion Park (the southern portion of Baldwin Avenue). To that extent the widening was related to the Fashion Park application.

The widening of the northerly portion of Baldwin Avenue from the boundary of the Fashion Park project to the freeway area was included by the City Council in March of 1972 as part of a six-year capital improvement program. On instructions of the City Council an environmental study was prepared in February or March of 1973, as to the effects of widening this portion of Baldwin Avenue. After public hearings the study was approved by the City Council on March 20, 1973.

On April 17, 1973, the City Council determined that the widening of

Baldwin Avenue northerly of Fashion Park would have no significant effect upon the environment and six days later a declaration to that effect was filed (§ 21152). The trial court found that the widening of the northerly portion of Baldwin Avenue is altogether separate from the other three developments (Fashion Park, the widening of the southerly portion of Baldwin Avenue and the Baldwin Avenue parking lot) involved here.

## PARKING LOT

In February 1973, Consolidated applied for a grading permit to develop a parking lot on a portion of its land to serve its race track facilities. The land had been zoned for parking use for many years and has an overall grade of about 5 percent. The trial court found that this work was not contemplated when the Fashion Park zoning was considered, and is not in any manner a development in which Anita Associates is involved. The court also found that the parking lot is related to Fashion Park only to the extent that one of its intended uses was to replace existing parking on the Fashion Park site. The court also found that the parking lot is primarily for race track employee parking and will be used by the public only on peak days. Before issuing the grading permit the director of public works requested Consolidated to aid in preparing an E.I.R. Consolidated did so assist, the court finding its action to be on a voluntary basis. After public hearings the planning department of the City Council approved the E.I.R. on March 20, 1973.

## ACTION BY THE TRIAL COURT

The trial court, with respect to Fashion Park and the widening of the southerly portion of Baldwin Avenue, concluded that after the approval of these developments by the voters on April 20, 1971, no discretion remained with the city and that all subsequent actions by the City Council "involved only ministerial administration of the developments." Backtracking from this finding, however, the court also concluded that even if any discretion remained, it was exhausted by the approval of the preliminary plans on August 15, 1972. Based on the findings, the court referred to the validating language of section 21169, page 717, *ante,* and concluded that Fashion Park and the widening of the southerly portion of Baldwin Avenue had been validated. The court further concluded that the isssuance of a grading permit for Fashion Park was also a ministerial act.

With reference to an argument made by Santa Anita that because the E.Q.A. is limited to projects to be carried out or approved by public agencies, the trial court concluded that projects approved by a vote of the electorate are "exempt" from the act. It determined, though, that the

Fashion Park and street widening projects were not exempt because the electorate only ratified the approval already contained in the City Council's earlier resolutions calling for the election and adopting the conditions upon which Fashion Park could be built.[3]

With respect to the widening of the northerly portion of Baldwin Avenue the court applied the substantial evidence rule[4] and on that basis approved the City Council's determination that the project would have a de minimus effect upon the environment.

As to the parking lot, the court concluded that the E.Q.A. did not apply to that work because only a ministerial act of issuing a grading permit was involved, because the work was "constitutionally exempt" under guideline section 15104, subdivision (a) as involving grading on a slope of less than 10 percent and because the work was exempt under section 21171—the moratorium provision relating to project developments (see p. 717, *ante*). Finally, the court concluded that the development of Fashion Park, the parking lot and the widening of the southern and northern portions of Baldwin Avenue are four separate developments. It stated that the widening of the northern portion of Baldwin Avenue was altogether separate from the other three developments, and is not connected with them. The other three projects were held to be related but not to constitute a single project under the E.Q.A.

---

[3] Because of the conclusions we have reached it is unnecessary to discuss the trial court's holding that petitioners are barred by the statute of limitation (§ 21167) and by the doctrine of laches (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 272).

[4] Section 21168 states that in an administrative mandamus proceeding brought under the E.Q.A. ". . . the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in light of the whole record." The trial court's judgment was entered prior to the decision of the Supreme Court in *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], which held that if an order or decision of a local administrative agency substantially affects "fundamental vested rights," the court must exercise its independent judgment in reviewing the evidence. In *Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], a case involving a granting of a variance to establish a mobile home park on 28 acres of the Santa Monica Mountains, the court stated (p. 510, fn. 1) that the petitioner there "does not suggest, nor do we find, that the present case touches upon any fundamental vested right." Holding that the local agency should have rendered findings to "bridge the analytic gap between the raw evidence and ultimate decision or order" (p. 515), the court then applied the substantial evidence test in the case at issue and held that the administrative findings there made did not include facts sufficient to justify the variance (pp. 518-522). (See, fn. 8, *infra.*)

DISCUSSION

■ *Fashion Park[5] and the parking lot projects.* These undertakings, in our view, are not covered by the E.Q.A. (§§ 21169 and 21171 and former Guideline § 15070, subd. (c) [now subd. (b)]). They are private "projects" within the definition of that term of art under section 21065, subdivision (c). For that reason anything done prior to December 5, 1972, the effective date of the section, with respect to public agency approval or the issuance of any "entitlement for use" has been "confirmed, validated and declared legally effective" notwithstanding a failure to comply with the act (§ 21169).

It is to be remembered that it is only discretionary acts which are within the purview of the E.Q.A. (§ 21080, subd. (a), Guideline § 15024).

As indicated the court found that all discretion was exhausted when the voters approved the zoning change on April 20, 1971, or alternatively that discretion was exhausted as to the limitation upon the City Council's approval of the preliminary plans on August 15, 1972. We do not find it necessary to discuss Santa Anita's argument that Guideline section 15037, subdivision (b) excludes voting from the definition of "project," since we find the work to be otherwise excepted from the scope of the E.Q.A. It is true, however, that the vote involved, among other things, the approval of a zoning change. Such an approval is defined as a discretionary act by section 21080, subdivision (a). Therefore, if we assume the zoning change is covered by the statute the 1971 vote was validated by section 21169. We need not decide whether any discretion was exercised by the City Council, within the meaning of the E.Q.A., when it approved the preliminary plans since this step was taken before December 5, 1972, and it was, therefore, validated by section 21169 (see, *San Francisco Planning, etc., Assn.* v. *Central Permit Bureau,* 30 Cal.App.3d 920, 930-931 [106 Cal.Rptr. 670]).

We must then look to see what occurred with respect to Arcadia's approval of Fashion Park and the parking lot after December 5, 1973. We immediately exempt anything occurring in the next 120 days, because the moratorium provisions of section 21171 expressly state that the E.Q.A. shall not apply (except for the validation conferred by § 21169) to private projects in that period. It was during this period that the parking lot application was made by Consolidated, that the city requested that environmental impact reports be prepared and that such reports were approved by the City Council after public hearings. Grading permits were also issued.

---

[5]We include in "Fashion Park" the widening of the southern part of Baldwin Avenue. That widening, as noted above, was a condition of the Fashion Park development and it was discussed in the E.I.R. prepared for Fashion Park.

Since the E.Q.A. did not apply to private projects at this time, petitioners may not complain about this conduct.

It remains to be seen, however, whether anything done *after* April 5, 1973, the 121st day after the effective date of the 1972 amendments to the E.Q.A. brings the statute into play.

It is clear that unless some discretionary action was taken after April 5th then absent other considerations,[6] there is nothing upon which the act can operate with respect to the Fashion Park or parking lot improvements.

█ Petitioners argue that the City Council's action on June 5, 1973, in approving the *final* building plans removed the project from the shield of section 21169. In our view the approval of the final building plans was not a discretionary act but was instead ministerial and hence not within the coverage of the statute (§ 21080, subd. (b)) and Guideline (§ 15032). Condition 3 of resolution No. 4185, made effective by the act of the voters at the time the zoning change was approved, expressly provides that: "The final plans shall comply substantially with the preliminary plans and shall be submitted to and shall be subject to approval by the City Council." Thus, the City Council in approving the final plans was only making a decision "upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority" (Guideline § 15032). Nothing of a discretionary nature happened after April 5, 1973; hence, the Fashion Park and parking lot projects were not covered by the E.Q.A. and, regarding them separately, the writ of mandate was properly denied.

*Baldwin Avenue Widening:* As indicated above the trial court concluded that the widening of the northern portion of Baldwin Avenue was altogether separate from the Fashion Park and parking lot developments. This conclusion is clearly supported by the facts recited above—long before an application was made for the Fashion Park zoning change, the city had determined that the advent of the Foothill Freeway would require that Baldwin Avenue be widened.

The widening was a municipal capital improvement project. As such it was not a private project under subdivision (c) of section 21065. Rather it was a public work under subdivision (a) of that section. Therefore, it

---

[6]Present Guideline section 15070, subdivision (b)(3) dealing with ongoing projects provides that as to private contracts where the permit or use entitlement was issued before April 5, 1973, and another discretionary approval is required after that date ". . . the project shall require an EIR or Negative Declaration only if the approval or approvals after April 5, 1973, involve a greater degree of responsibility or control over the project as a whole than did the approval or approvals prior to that date." Former Guideline section 15070, subdivision (e), was to the same effect.

was clearly subject to the provisions of the E.Q.A. and was not covered by either the validating provisions of section 21169 or the moratorium of section 21171.

■ As indicated above, the city filed a Negative Declaration with respect to this project—that is, a statement that it would have no significant impact on the environment. The trial court found that substantial evidence supported this conclusion. ■ It was proper to use the substantial evidence test in reaching this determination (§ 21168.5). That section provides that in an action other than an administrative mandamus proceeding brought pursuant to section 21168[7] the court's inquiry should extend only to whether there was a prejudicial abuse of discretion and further provides that such an abuse is established if the agency's decision is not supported by substantial evidence.

It is argued that under the decision in *Strumsky* v. *San Diego Employees' Retirement Assn., supra,* 11 Cal.3d 28, the court constitutionally was required to independently review the evidence. Such argument is misplaced. The requirement applies only where a fundamental vested right is involved and on this record we cannot hold that the petitioners' interest in the width of Baldwin Avenue was such a right (see, *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 510, fn. 1 at p. 515; *Friends of Lake Arrowhead* v. *Board of Supervisors,* 38 Cal. App.3d 497, 517-518 [113 Cal.Rptr. 539]).

■ The Negative Declaration was based on environmental assessments issued after public hearing and upon the consideration of varying alternatives in connection with the street widening. A detailed showing was given of the number of trees and other plantings that would be affected by the project as well as to the replacement landscape that would take place. Comment was made as to the impact on air quality and noise. These considerations provide substantial evidence to support the agency's determination.

■ In passing on the questions arising out of the E.Q.A. it is the duty of the court to consider the legal sufficiency of the steps taken by the local agency in determining whether or not any proposed action may have subsequent effects on the environment. It is not the duty of the court to determine the validity of the conclusions reached (*Environmental Defense Fund,*

---

[7]Section 21168 is not applicable to this proceeding. It applies only to proceedings ". . . in which by law a hearing is required to be given . . ." The E.Q.A. does not require any such hearing (*Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors,* 38 Cal.App.3d 272, 284 [113 Cal.Rptr. 338]; Guideline § 15164).

*Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 705 [104 Cal.Rptr. 197]).

We cannot say the report was inadequate as a matter of law (*Lake Arrowhead, supra,* at p. 516; *Palm Desert, supra,* at p. 288).

### THE CUMULATIVE EFFECT OF THE PROJECT

■ It is abundantly clear from the E.Q.A. (e.g., §§ 21083, subd. (b), 21090, 21100, subd. (g)) and the guidelines (e.g., §§ 15069, 15070, 15143, subd. (g)) that careful consideration must be given to the cumulative effect of projects proposed to be undertaken. The courts are enjoined to construe the statute liberally in light of its beneficent purposes. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 259.) The highest priority must be given to environmental considerations in interpreting the statute (*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795, 804). Its requirements cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial.

With these considerations in mind, we briefly consider two different arguments made by petitioners as to the cumulative effect of the parking lot, Fashion Park and street widening projects. ■ The first argument, in essence, is that all of the projects should have been considered together in a combined E.I.R. and that this was not done (see, *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d 695, 706). To this the answers are two-fold. It is clear to us that the shopping center and parking lot projects together with the widening of the southern portion of Baldwin Avenue are related to each other and that in assessing their environmental impact they should be regarded as a single project under the E.Q.A.[8] However, as we have pointed out each of these projects is exempted from the act's application by reason of the ministerial and

---

[8]The trial court's conclusion that the three works mentioned do not constitute a single project is erroneous. We note that the foreword to Fashion Park E.I.R. states: "Separate Draft Environmental Impact Reports have been prepared and are being considered contemporaneously herewith relating to other projects involving the proposed widening of Baldwin Avenue northerly of the shopping center and a proposed additional parking lot as part of the Santa Anita racetrack facility. The materials set forth therein have been revised and carefully considered in the preparation of this Report."

validation provisions of the E.Q.A. The act simply does not apply to those projects to the extent that they have been presently approved. The trial court, therefore, was correct in concluding that no legal consequences resulted because of the relationship which existed. Secondly, we have already pointed out that factually and legally the remaining work—widening the northern portion of Baldwin Avenue—was a separate project.

Petitioners also contend that the Fashion Park project occupies about 72 acres of the 400 acres owned by Consolidated and is only preliminary to Consolidated's discontinuance of its race track operations and a projected development of the entire 400 acres.

Clearly if in the future Consolidated or Anita Associates or any other entity attempt to develop the balance of the 400 acres any efforts which involve discretionary acts will be within the purview of the E.Q.A. and those charged with applying the act will then have to consider all effects on the environment which any new project might produce. They will also take into account in that connection the existing changes already wrought by the shopping center, parking lot and street widening activities theretofore undertaken. (*Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 378-379 [113 Cal.Rptr. 433].)

We do not, of course, attempt to decide in this appeal whether any action taken after the date of the judgment below is such as to call for invocation of the E.Q.A.

We have considered, but find it unnecessary to discuss, other contentions raised by the parties.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied November 13, 1974, and the opinion was modified to read as printed above. The petition of appellant Plan For Arcadia, Inc. for a hearing by the Supreme Court was denied December 26, 1974.