[No. F042272. Fifth Dist. Feb. 4, 2004.]

ASSOCIATION FOR A CLEANER ENVIRONMENT, Plaintiff and Appellant, v.
YOSEMITE COMMUNITY COLLEGE DISTRICT et al., Defendants and Respondents.

630

632

**COUNSEL**

Trutanich • Michel, C. D. Michel, Jeffery L. Caufield and Glenn S. McRoberts for Plaintiff and Appellant.

Law Offices of Marilyn Kaplan, Marilyn Kaplan; Bingham McCutchen, Stephen L. Kostka and Geoffrey L. Robinson for Defendants and Respondents.

**OPINION**

**DAWSON, J.**—An association of citizens appeals the denial of its petition for a writ of mandate and contends that a community college violated the California Environmental Quality Act (CEQA)[1] when it failed to perform an initial environmental study in connection with its decision to close and remove a campus shooting range and transfer certain classes to a range off campus. The community college argues (1) its decision and actions were not

---

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

a "project" subject to CEQA, (2) if a project existed, it was exempt from CEQA, and (3) the matter is moot because the decisions have been implemented.

We conclude the whole of the community college's action constitutes a project for purposes of CEQA, the project is not exempt, and the matter is not moot. Accordingly, we reverse and remand to the superior court with direction to issue a writ of mandate requiring that an initial environmental study be conducted.

## FACTS AND PROCEEDINGS

Appellant Association for a Cleaner Environment (ACE) is a nonprofit organization and alleges that it represents citizens who (1) object to the destruction of an all-weather shooting range at Modesto Junior College (MJC Range) and (2) are concerned with the failure of the respondents to comply with CEQA. Donald G. Clark[2] is an individual residing in San Joaquin County and a professor emeritus at Modesto Junior College (MJC).

ACE and Clark filed a petition for writ of mandate against respondents Yosemite Community College District (District) and the District's Board of Trustees (Board). The District consists of (1) Columbia College in Columbia and (2) MJC. Chancellor Pamila Fisher is the chief administrative officer of the District. The seven-member Board governs the District.

In 1975, the MJC Range was built on the west campus of MJC. The MJC Range was used for firearms courses offered through the Criminal Justice Training Program and the Administration of Justice Program. The MJC Range also was used by law enforcement officers, individuals from a private security department and community service classes.

The minutes of the Board meeting conducted on April 10, 2001, provide the following description of events that led to the current litigation:

". . . Since 1975, the campus has grown considerably and the student population will more than double when the Sierra Halls are fully occupied. In addition, we have added four new child care facilities. This year, a new soccer field was built immediately south of the range based on plans for the range's removal. Parking lots are scheduled to be built immediately west of the range next year, before Sierra Halls open in the summer of 2002. Eventually two more classroom buildings will be built nearby and the Agriculture Complex is planned for the current site.

---

[2] Mr. Clark was a petitioning party below. He does not appear on the appeal.

"Although the Firing Range has served as an important part of the Criminal Justice Training Center during the last 26 years, it has been a source of concern to students, staff and neighbors. Consequently, the Master Plan adopted by the Board of Trustees in 1991, and the Joint Powers Agreement with Stanislaus County and the City of Modesto adopted in 1998, called for the Firing Range to be removed after the firearms classes are moved to the new facility built by the JPA, which includes the Modesto Police and the Stanislaus County Sheriff's Office. This plan was consistent with the moving of the entire Criminal Justice Training Program to its new facility on Crows Landing Road in 1998. Since then, all other West Campus CJTC old buildings have been removed.

"The new [Modesto Police Department] firing range, which is part of a larger complex including equestrian and canine training, will be completed some time in late summer or early fall. When it is complete, our classes, our weapons arsenal, and any useable equipment, and our range master will be located at the new site. The CJTC Academy, Modesto Police, and Stanislaus County Sheriff, as well as other law enforcement agencies, comprise 90 percent of the activity at the range and will be served there. In addition, our two classes per term which are open to the public also will be offered there.

"Thus, the remaining issue before the Board of Trustees was the future status of the old Firing Range once the program is relocated. Operating two facilities would incur significant extra costs for staff, utilities, maintenance, and liability insurance. It is staff's conclusion that it is inappropriate to have an active public firing range on a growing and heavily populated campus. Complaints from students, staff and neighbors regarding safety and noise, as well as concerns about environmental issues, also contribute to this conclusion. The facility could be sold to a private entity, donated to a public agency, demolished, or stay vacant until a later date."

In addition to the foregoing reference to plans for removal of the MJC Range, the administrative record contains other statements about its removal. A March 1, 2001, letter from the District Director of Facilities and Plant Operations, Maria Baker, to Chancellor Fisher states: "The [MJC] Facilities Master Plan for the West Campus assumes the removal of the firing range. This has been noted on all the plans for the MJC West Campus at least since 1994 and may even pre-date that time." Also in March 2001, Chancellor Fisher wrote two letters referring to plans for removal of the MJC Range.

The joint powers agreement referenced in the April 10, 2001, minutes is titled "Joint Exercise of Powers Agreement of the Criminal Justice Training Agency by and between the Yosemite Community College District[,] the County of Stanislaus and the City of Modesto" (unnecessary capitalization

omitted) and is dated as of July 1, 1997 (JPA). The JPA was entered for purposes of outlining the duties, responsibilities and obligations of each party as they relate to providing educational services for the MJC Regional Criminal Justice Training Program.

Because of concerns about lead contamination and safety, the District had the MJC Range examined by an environmental firm, an architect and its insurance provider. Hazard Management Services, Inc. (HMS) took soil and wipe samples from the MJC Range for purposes of determining levels of lead contamination and reported its results to the District. HMS concluded that the level of lead in the soil samples exceeds California regulatory levels and therefore qualified the materials as hazardous waste.

After visiting the MJC Range, the architect concluded (1) the range was in need of maintenance, (2) direct shots were not escaping the range, but bullets or fragments were breaking out after initial impact, and (3) the District should confront the serious personal safety issue of escaping bullets or fragments.

Valley Insurance Program Joint Powers Authority sent the District a letter stating that from a general liability and workers' compensation risk control perspective, it considered the location of an outdoor firing range adjacent to the educational complex and recreational athletic field to be unusual and out of the ordinary.

After receiving information from HMS, the architect, the insurance provider and many other sources, the Board adopted the resolution that is at the center of this appeal. The minutes from that October 15, 2001, meeting provide: "A motion was made by Mr. Neumann, seconded by Mr. Allen, that the Board of Trustees authorize proceeding with conducting lead abatement at the MJC firing range site, closing the range and donating salvageable portions of the firing range to the Tuolumne County Sheriff's Office, and preparing an agreement with the County of Tuolumne regarding the transfer of this property and the provision of firearms training at their new range. [¶] The motion carried by a vote of 6 ayes . . . and 1 nay . . . ."

Subsequently, an addendum dated October 18, 2001, was added to the District's previously drafted request for bids on the lead cleanup of the MJC Range and surrounding area. The addendum stated that the District had decided to close the MJC Range but that the decision to dismantle or demolish it was still in question and would not be decided for some time. Nevertheless, the administrative record contains no minutes showing that the Board changed the resolution adopted at the October 15, 2001, meeting.

On November 27, 2001, ACE and Clark filed a petition for writ of mandate alleging that the Board's action on October 15, 2001, failed to comply with CEQA. After an administrative record was prepared, the District and Board filed a motion for judgment pursuant to Code of Civil Procedure section 1094. The motion was fully briefed by the parties and oral argument was heard by the superior court. On January 9, 2003, the superior court issued a minute order denying the petition for writ of mandate and stating: "Court finds that there was no project subject to [CEQA]. Further, the issue is now moot." ACE filed a timely notice of appeal.

## DISCUSSION

### I. *Application of CEQA and Preliminary Review by Agency*

■ Generally, CEQA "shall apply to discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).) To determine whether a proposed activity falls within this mandatory language and therefore is subject to CEQA, a public agency is required to conduct a preliminary review. (See *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612], citing Cal. Code Regs., tit. 14, §§ 15060, 15061.)[3] This preliminary review is the first step in the three-step process used to decide which document, if any, is required for CEQA compliance. (Guidelines, § 15002, subd. (k)(1).)[4] The second step, if reached, requires the agency to conduct an initial study. (Guidelines, §§ 15002, subd. (k)(2), 15063.) In this case, ACE contends the District should have reached the second step and conducted such a study.

■ The determinations that an agency makes during a preliminary review are subject to judicial review under the abuse of discretion standard contained in section 21168.5. (See *Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

---

[3] In all further citations, title 14, section 15000 et seq. of the California Code of Regulations will be referred to as the Guidelines.

[4] Guidelines section 15002, subdivision (k)(1) states: "In the first step the lead agency examines the project to determine whether the project is subject to CEQA at all." This sentence is merely descriptive and not all inclusive, because the first step, i.e., the preliminary review, does not necessarily involve a "lead agency" or a "project" as those terms are defined elsewhere in the Guidelines. (Guidelines, §§ 15367, 15378.) Indeed, the sentence begs one of the critical questions addressed in the preliminary review—whether a "project" exists.

## A. *Activities Properly Considered As a Single Project*

A number of issues may arise during a preliminary review.[5] The first issue we address is "whether the subject matter of the action constitutes a 'project' subject to CEQA." (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA), *supra*, at p. 57.)

Under CEQA, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.)

This definition is amplified in the Guidelines, which define a "project" as *"the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a), italics added.)

"Whether an act constitutes a 'project' within the purview of CEQA 'is an issue of law which can be decided on undisputed data in the record on appeal,' and thus presents no question of deference to agency discretion or review of substantiality of evidence. [Citation.]" (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470 [11 Cal.Rptr.2d 792].)

Stated otherwise, "[w]hether a particular activity constitutes a project in the first instance is a question of law." (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984 [28 Cal.Rptr.2d 305].)

Addressing what constitutes a project for purposes of CEQA, the Supreme Court has stated that CEQA is "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) From this

---

[5] According to one commentator, "an agency may have to make up to five threshold inquiries" in conducting a preliminary review. (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) p. 57.)

principle, "it is clear that the requirements of CEQA 'cannot be avoided by chopping up proposed projects into bite-sized pieces' which, when taken individually, may have no significant adverse effect on the environment (*Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96] . . . ." (*Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854 [139 Cal.Rptr. 176].)[6]

In this case, the pivotal question concerns what actions should be considered as part of the potential project. ACE contends the actions to be analyzed include a combination of the closure, cleanup and destruction of the MJC Range as well as the transfer of the shooting range operations to a new location, which transfer effectively creates an extension campus at the city range. Respondents dispute ACE's contention that the Board took action to destroy the MJC Range. They assert here, and contend the administrative record shows, that the Board did not choose to demolish the range at the time it decided to close the range and clean up the lead contamination. Further, according to respondents, "no decision has yet been made to remove the physical facility." In response, ACE asserts the evidence is overwhelming that (1) the District has decided to close and dismantle the MJC Range and transfer its environmentally troubled firing range operations; and (2) these actions are part of a single, interrelated "project."

■ We start with the premise that "the whole of an action" must be considered in determining whether or not a "project" exists. (Guidelines, § 15378, subd. (a).) After a careful review of the administrative record, we disagree with the respondents' assertion that it shows the District has not yet decided to remove the MJC Range. The record includes the following information to the contrary. First, the Board minutes clearly indicate that plans for the removal of the MJC Range have been in place for almost a decade. Second, these plans have been reiterated in correspondence by District personnel. Third, the implementation of the range removal plans has been advanced by the District's decisions to develop the land near the range and by its neglect of range maintenance, thereby increasing the safety concerns arising from range operation.

On October 15, 2001, the Board voted to conduct lead abatement at the range, close it, and donate salvageable portions to the Tuolumne County Sheriff's Office (Tuolumne). An agreement regarding this donation was to be drafted and would include a provision for firearms training at a new range to be constructed in Tuolumne County. That part of the Board's resolution which related to donating salvageable portions of the range to Tuolumne

---

[6] In *Plan for Arcadia, Inc. v. City Council of Arcadia, supra,* 42 Cal.App.3d at page 726, the shopping center construction, parking lot construction and the widening of an adjacent portion of the street were regarded as a single project for purposes of CEQA.

stemmed from a report given by District's Chancellor Fisher, at the October 15th Board meeting, in which she announced a new development—to wit, Tuolumne's interest in taking salvage from the range. On October 18, 2001, the District issued an addendum to its request for bids on lead abatement which stated the decision to "dismantle or demolish" the range was still in question. That the District could not yet say with certainty whether the range was to be dismantled or demolished, however, does not change the Board's decision, made on October 15, to destroy it. We note that respondents supply nothing, save the ambiguous language of the October 18th addendum, and in the face of overwhelming evidence to the contrary, to support the assertion that no decision to remove the MJC Range has yet been made.

Because CEQA must be construed to effectuate its purpose of protecting the environment, and because a group of interrelated actions may not be chopped into bite-size pieces to avoid CEQA review, we conclude that the closure and removal of the MJC Range, the cleanup activity, and the transfer of shooting range activity and classes to another range are all part of a single, coordinated endeavor. As a result, those activities constitute the whole of the action that we consider for purposes of determining the existence of a "project" for purposes of CEQA.

Clearly, these activities meet the first test for a "project": whether there has been an "activity directly undertaken by any public agency." (§ 21065, subd. (a).)

The second test for a "project" is whether the activities have a "potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a).) This test is addressed by respondents only with reference to the lead abatement and range closure, which they attempt to segregate from the whole of their action. Their myopic analysis is not convincing, however, and we conclude that the whole of their action does have a potential for direct or indirect physical change in the environment.

For example, the removal of the MJC Range has the potential to spread lead contamination. If the removal involves the donation and transfer of some of the salvageable portions of the firing range to Tuolumne, lead contamination could spread at the removal site as well as the site receiving the salvageable portions. The description contained in the reply brief of respondents illustrates this potential: "As HMS explained, cars driving on lead-contaminated soil could lift lead-contaminated dust into the air. Students and staff walking through the area could pick up lead contamination on their shoes and clothing, potentially spreading it throughout the campus or taking it to their homes." This summary of matters in the administrative record shows

that the physical removal of the MJC Range has the potential for spreading lead contamination, which is a direct physical change in the environment. Whether this potential of lead contamination can be, or has been, avoided by completing lead abatement first should be addressed in an initial study.

■ Thus, the District's activities are a "project" and should have been the subject of an initial environmental study in accordance with Guidelines section 15063, unless those activities were otherwise exempt. (See Guidelines, § 15061.) Because respondents' arguments concerning exemptions and mootness are based upon their inappropriately narrow characterization of the activity included in the project, those issues are resolved without difficulty.

B. *The Whole of the District's Activities Were Not Exempt*

The second issue arising in connection with the preliminary review is "whether the action is nevertheless exempt from CEQA review either by a statute or pursuant to a 'categorical exemption' adopted by the Resources Agency." (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA), *supra*, at p. 80.)

■ Respondents argue that two separate categorical exemptions apply in this case. First, Guidelines section 15322 exempts "the adoption, alteration, or termination of educational or training programs which involve no physical alteration in the area affected or which involve physical changes only in the interior of existing school or training structures." Respondents' reliance on this exemption fails because it is premised on an underinclusive view of the activities constituting the project. The whole of the action involved in this case includes the removal of the MJC Range and the transfer of operations to the city range. The physical changes from the removal of the MJC Range alone go beyond changes to the interior of a training structure. Consequently, the exemption does not apply.

Second, respondents argue that the lead abatement activity is categorically exempt pursuant to Guidelines section 15330 which applies to "any minor cleanup actions taken to prevent, minimize, stabilize, mitigate, or eliminate the release or threat of release of a hazardous waste or substance which are small or medium removal actions costing $1 million or less."

■ As pointed out by ACE, this exemption may cover the lead abatement portion of the project, but does not cover the whole of the action that constitutes the project. Therefore, the District cannot rely on this exemption to relieve it of its responsibility to undertake an initial study of the project.

## II. *The Matter Is Not Moot*

Respondents argue that this matter is moot because the challenged act has been completed and a writ may not issue in a CEQA case where there is no present controversy to be adjudicated.

■ An appeal is moot if it is impossible for an appellate court to grant an appellant any effectual relief. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717]; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1193 [23 Cal.Rptr.2d 878].) This rule of law was applied by this court in *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880 [92 Cal.Rptr.2d 268], where we held that a CEQA matter was not moot simply because the car wash project had been completed and had begun operating. (*Id.* at p. 888.) Effective relief was possible because requiring the preparation of an environmental impact report could result in modification or removal of the project. (*Id.* at p. 889.)

■ Similarly, in this case there is a possibility that directing the respondents to conduct an initial study may result in a mitigated negative declaration or an environmental impact report containing mitigation measures.

As with other arguments made by respondents, the mootness argument fails because it does not consider all of the activities properly included in the project. Furthermore, the circumstances presented in this case are factually distinct from those at issue in *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370 [113 Cal.Rptr. 433], which involved trees that had been cut down and replaced.

Accordingly, we determine this case is not moot.

## III. *Conclusion*

■ We hold in this case only that the respondents have skipped an essential step in the implementation of their decision to remove the MJC Range and transfer the operations previously conducted there to another or other facilities. Before proceeding, respondents must conduct an initial study. What will be the result of that study is not our concern. Neither is the wisdom of respondents' decision to close and remove the range our concern, and we emphatically disavow any attempt to second-guess that decision. We require only that respondents comply with the mandates of CEQA.

## DISPOSITION

The judgment filed January 31, 2003, denying the petition for writ of mandate is reversed, and the matter is remanded to the superior court with directions to grant appellant's petition for a writ of mandate directing the respondents to undertake an initial environmental study of the project. Costs on appeal are awarded to appellant.

Dibiaso, Acting P. J., and Gomes, J., concurred.

On March 4, 2004, the opinion was modified to read as printed above.