[No. B162667. Second Dist., Div. Seven. Nov. 19, 2003.]

CITY OF BURBANK, Plaintiff and Respondent, v.
BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY, Defendant;
MICHAEL NOLAN, Intervener and Appellant.

466

**COUNSEL**

Moskowitz, Brestoff, Winston & Blinderman, Dennis A. Winston and Barbara S. Blinderman for Intervener and Appellant.

Dennis A. Barlow, City Attorney; Kaplan Kirsch & Rockwell and Peter J. Kirsch for Plaintiff and Respondent.

**OPINION**

**JOHNSON, Acting, P. J.**—In 2001, the voters of the City of Burbank passed an initiative measure which placed numerous restrictions and conditions on the Burbank-Glendale-Pasadena Airport. This initiative provided specific and

detailed directions regarding how, when and under what circumstances the City of Burbank could consent to acquisition, financing, zoning, construction or modification of any land or facility at or around the Burbank-Glendale-Pasadena Airport. Within a week of the election the City of Burbank filed this action for declaratory relief to seek a ruling on the validity of the initiative measure. The trial court declared the measure invalid. The court found the measure an inappropriate subject for an initiative, and further found its provisions violative of state statutory law and state constitutional law. Accordingly, the trial court entered judgment in favor of the City of Burbank. Characterizing the measure as a mere zoning regulation, a major proponent of the initiative contends the measure is legal, constitutional and the City of Burbank is bound to enforce this city law duly adopted by initiative. We conclude the initiative conflicts with the powers delegated exclusively to the city council in Public Utilities Code section 21661.6. Because this statute addresses a matter of statewide concern, we find the statute prevails, making legislation by initiative invalid. Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

In 1977, the cities of Burbank, Glendale and Pasadena entered into a joint powers agreement[1] to acquire and operate an existing airport then privately owned by the Lockheed Corporation. The joint powers agreement created the Burbank-Glendale-Pasadena Airport Authority (Airport Authority). This joint powers agreement, in turn, empowered the Airport Authority to acquire, operate, repair, maintain, improve and administer the airport.[2]

The airport is physically situated within the cities of both Burbank and Los Angeles. However, the terminal, parking areas, majority of the runways and the support areas are located within the boundaries of Burbank. Burbank thus reviews airport-related projects to ensure consistency with its zoning codes and general plan, and issues building and other permits for activities at the airport.

The Airport Authority's attempted exercise of its statutory powers to expand or relocate the airport has generated considerable litigation over the years.[3] The desire to control airport expansion or relocation has also inspired ballot initiatives.

---

[1] See Government Code section 6500 et seq. authorizing joint powers agreements between and among public agencies.

[2] See *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (1999) 72 Cal.App.4th 366, 370 [85 Cal.Rptr.2d 28].

[3] See, e.g., *City of Burbank v. Lockheed Air Terminal, Inc.* (1973) 411 U.S. 624 [36 L.Ed.2d 547, 93 S.Ct. 1854]; *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866]; *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577 [284 Cal.Rptr. 498]; *Burbank-Glendale-Pasadena Airport*

Measure A is one such ballot initiative. In a preelection review of the initiative, the city attorney provided the Burbank City Council with his opinion Measure A was likely illegal and unconstitutional. The city attorney warned the city council enforcement of Measure A could expose the city and/or its officials to potential liability. An analysis by city staff concluded the costs and effects of implementing Measure A would likely be significant, but could not be accurately assessed because of the vague and ambiguous wording of the initiative measure. The Burbank City Council nevertheless submitted the initiative to the voters in a special election.

Burbank voters approved Measure A by 58 percent of the voters submitting qualified ballots in a special initiative election on October 9, 2001. Measure A became law the next day on October 10, 2001.[4] On this day, the president of the Airport Authority wrote a letter to the Mayor of Burbank. Among other things, the Airport Authority urged Burbank to mount a legal challenge to the validity of Measure A or risk indefinite policy paralysis. The Airport Authority discussed several perceived legal defects in Measure A and warned, "The City faces potentially significant liability in damages and attorneys fees to land owners and businesses whose rights would be adversely affected if the measure is enforced."

Measure A requires Burbank to hold a referendum election with a two-thirds affirmative vote prior to any city council consent to the "financing and/or construction of an airport terminal." Measure A also specifies the Burbank City Council may not consent to any acquisition of land, or rezoning of any land for airport use, "nor consent to the financing or construction of any new, rebuilt, relocated or expanded Airport facility, under any conditions, or due to any circumstances, unless and until the Airport has complied with . . ." the 12 specified conditions in the initiative. The 12 conditions imposed against the Airport Authority include (1) mandatory curfews on aircraft operations; (2) maximum limits on numbers of flights; (3) maximum limits on numbers of passengers; (4) adopting rules to impose fines and sanctions for curfew and cap violations; (5) implementing a legally enforceable ban on certain aircraft not meeting noise criteria; (6) developing a program for sound insulation which provides matching funds; (7) banning easements used as sound abatement measures; (8) requiring certified environmental impact reports for all property the Airport Authority "owns, leases or uses for Airport or Airport related purposes"; (9) developing a master plan for all airport property approved by the Burbank City Council; (10) banning the lengthening of existing runways, adding additional runways, or modifying runways to accommodate heavier or larger aircraft; (11) developing a legally enforceable

---

*Authority v. City of Burbank* (9th Cir. 1998) 136 F.3d 1360; *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra*, 72 Cal.App.4th 366.

[4] California Constitution article II, section 10, subdivision (a); Elections Code section 9217.

plan for Burbank to impose and collect a daily fine of at least $5,000 for each day the Airport Authority violates the terms of Measure A; and (12) agreeing to reimburse Burbank for lost property tax revenues and for its share of infrastructure improvements and maintenance.

Measure A also imposes duties on Burbank (1) to establish a city department to enforce Measure A's terms and conditions and to investigate alleged violations; (2) to hire an independent consultant to monitor noise levels; and (3) to amend any and all existing city laws to conform to Measure A's requirements. Measure A specifies any amendment to Measure A's provisions requires an affirmative vote of two-thirds of the electorate at a regular city election.[5]

After the election, the Burbank City Council processed two applications from the Airport Authority and approved two airport-related projects. A tenant of Airport Authority property sought a permit to upgrade an electrical panel in conjunction with the construction of a spray booth. The city council adopted a resolution to approve the work, which had been completed prior to passage of Measure A in any event. The second resolution concerned grading and building permits for construction of a parking lot. The Burbank City Council adopted the resolution and issued the permits because all construc-·tion would be entirely outside the boundaries of the Airport Authority, and on land neither owned nor controlled by the Airport Authority. However, there remained pending projects on which the Burbank City Council took no action. After an aircraft overshot the runway and came to a stop on a public highway, the Airport Authority sought approval from Burbank to relocate the two airport parking lots which had been most affected by the aircraft's near miss. Burbank concluded its consent to these construction projects would require compliance with the 12 conditions imposed in Measure A as "construction" of a "new, rebuilt, relocated or expanded Airport facility." To approve the parking lot projects would require months, if not years, if for no other reason, to adopt and implement Measure A's various programs and to identify and amend all affected city laws. On the other hand, if Burbank denied consent the city then exposed itself to liability and other litigation costs in the event the Airport Authority chose to challenge its withholding of consent for these public safety related projects.

The Burbank City Council thereafter adopted a resolution which in essence imposed a moratorium on approvals for airport, or airport-related, projects until the validity of Measure A could be judicially determined. Mirroring the language of Measure A, the resolution stated Burbank would impose a freeze on approvals pertaining to the "financing or construction of any new, rebuilt, relocated or expanded Airport facility under any conditions or due to any

---

[5] See the attached appendix for the full text of Measure A.

circumstances." The resolution directed city staff to accept and process such applications, but to hold them in abeyance pending a court ruling on the validity of Measure A.

On October 16, 2001, Burbank filed this action against the Airport Authority for declaratory relief seeking to have Measure A declared unconstitutional or illegal. The Airport Authority agreed Measure A should be declared illegal. Because its views were aligned with Burbank, the Airport Authority perceived no actual controversy between the parties and chose not to be a party to the action. The Airport Authority demurred to Burbank's first amended complaint, and then defaulted when the court overruled its demurrer.

Thereafter Burbank solicited plaintiff in intervention and appellant, Michael Nolan, an activist who had worked for passage of Measure A, to defend Measure A. Pursuant to the parties' stipulation, Nolan filed a complaint and intervened in the action. He challenged Burbank's claims of illegality and sought a declaration Measure A was constitutional, legal and enforceable. Nolan also asserted Burbank lacked standing to challenge the validity of one of its own laws duly passed by the electorate.

Burbank moved for summary judgment and requested default judgment be entered against the Airport Authority. Nolan opposed Burbank's motions, and in addition, moved for judgment on the pleadings. Ultimately, the trial court ruled in favor of Burbank on all pending motions and entered judgment in its favor. The court (1) found the case presented an actual controversy impacting Burbank's legal rights and duties and thus Burbank had standing to seek the requested declaratory relief; (2) declared Measure A impermissibly interfered with powers delegated exclusively to the Burbank City Council under Public Utilities Code section 21661.6; (3) declared Measure A's two-thirds vote requirement on airport-related issues violated the California Constitution and state election law; (4) declared the subject matter of Measure A was beyond the initiative power; (5) declared Measure A conflicted with the California Environmental Quality Act; (6) declared Measure A imposed conditions beyond Burbank's police powers; and (7) declared no legally enforceable provision of Measure A remained to be enforced.

Nolan appeals to challenge the trial court's findings and conclusions.

## DISCUSSION

## I. STANDARD OF REVIEW

The parties do not dispute, and we agree, the issues presented in this appeal are pure questions of law. We thus review both Burbank's motion for

summary judgment and Nolan's competing motion for judgment on the pleadings under the de novo standard of review.[6]

## II. PUBLIC UTILITIES CODE SECTION 21661.6 ENTRUSTS DISCRETIONARY POWER OVER THIS MATTER OF STATEWIDE CONCERN EXCLUSIVELY TO THE BURBANK CITY COUNCIL, PRECLUDING AN INITIATIVE MEASURE COVERING THE SUBJECT MATTER.

Division 9 of the Public Utilities Code controls aviation matters within the state. In enacting the State Aeronautics Act the Legislature declared the purpose of the Act was "to further and protect the public interest in aeronautics and aeronautical progress. . . ."[7] The Legislature set forth 10 goals to further the purposes of the Act, including "[g]ranting to a state agency powers, and imposing upon it duties, so that the state may properly perform its functions relative to aeronautics and effectively exercise its jurisdiction over persons and property, assist in the development of a statewide system of airports, encourage the flow of private capital into aviation facilities, and cooperate with and assist political subdivisions and others engaged in aeronautics in the development and encouragement of aeronautics."[8] The Act created a Department of Transportation and State Aeronautics Board to effect "uniformity of the laws and regulations relating to aeronautics consistent with federal aeronautics laws and regulations."[9]

Article 3 of the State Aeronautics Act pertains to the regulation of airports, both public and private.[10] This article generally governs construction of new airports,[11] expansion or enlargement of existing airports,[12] approval of airport sites,[13] permits,[14] noise regulation[15] and the like. Section 21661.6 of this article is the provision which specifies procedural criteria for expanding or enlarging an existing public airport. Public Utilities Code section 21661.6 provides:

---

[6] *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra,* 72 Cal.App.4th 366, 373; *Wolf v. Mitchell, Silberberg & Knupp* (1999) 76 Cal.App.4th 1030, 1035 [90 Cal.Rptr.2d 792]; *Kapsimallis v. Allstate Ins. Co.* (2002) 104 Cal.App.4th 667, 672 [128 Cal.Rptr.2d 358].

[7] Public Utilities Code section 21002.

[8] Public Utilities Code section 21002, subdivision (d).

[9] Public Utilities Code section 21002, subdivision (c).

[10] Public Utilities Code section 21661 et seq.

[11] Public Utilities Code section 21661.5.

[12] Public Utilities Code section 21661.6.

[13] Public Utilities Code sections 21662, 21664 and 21664.5.

[14] Public Utilities Code sections 21662, 21664.5, 21666 and 21668.

[15] Public Utilities Code sections 21669, 21669.1, 21669.2, 21669.3 and 21669.4.

"(a) Prior to the acquisition of land . . . by any political subdivision for the purpose of expanding or enlarging any existing publicly owned airport, the acquiring entity shall submit a plan of that expansion or enlargement to the *board of supervisors* of the county, or the *city council* of the city, in which the property proposed to be acquired is located.

"(b) The plan shall show in detail the airport-related uses and other uses proposed for the property to be acquired.

"(c) The *board of supervisors* or the *city council*, as the case may be, shall, upon notice, conduct a public hearing on the plan, and shall thereafter approve or disapprove the plan.

"(d) Upon approval of the plan, the proposed acquisition of property may begin.

"(e) The use of property so acquired shall thereafter conform to the approved plan, and any variance from that plan, or changes proposed therein, shall first be approved by the appropriate *board of supervisors* or *city council* after a public hearing on the subject of the variance or plan change.

"(f) The requirements of this section are in addition to any other requirements of law relating to construction or expansion of airports."[16]

Nolan notes the absence of language in Public Utilities Code section 21661.6 stating discretionary power whether to expand or relocate airports resides *exclusively* in a board of supervisors or city council. He claims this lack of specific language in the statute, combined with the presumptive validity of Measure A as an initiative measure, compels the conclusion initiative measures on the subject matter of airport construction to enlarge or expand an airport is not preempted. Moreover, Nolan asserts, Measure A does not violate Public Utilities Code section 21661.6 in any event. Under Measure A, he notes, the Airport Authority must still submit all project requests to the Burbank City Council for approval. He points out the city council thus retains the power to determine whether the Airport Authority has satisfied Measure A's preconditions for Burbank's consent to the project. For these reasons Nolan claims Measure A does not impermissibly infringe on any rights of Burbank's city council at all, and in any event, initiatives passed by the electorate are presumptively valid.

---

[16] Italics added. See footnotes 12, 13, and 14 (examples of other requirements).

The California Constitution in article II, section 11, guarantees a local electorate's right to initiative and referendum.[17] " ' "[I]t has long been our judicial policy to apply a liberal construction to this power whenever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' (*Associated Home Builders etc. Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473].) Thus, we will presume, absent a clear showing of the Legislature's intent to the contrary, that legislative decisions of a city council or board of supervisors . . . are subject to initiative and referendum."[18]

"This presumption rests on the fact that the 1911 amendment to the California Constitution conferring the right of initiative and referendum was '[d]rafted in light of the theory that all power of government ultimately resides in the people' and that 'the amendment speaks of initiative and referendum, not as a right granted the people, but as a power reserved by them.' "[19]

The presumption in favor of the right of initiative and referendum can be rebutted by evidence of a legislative intent to delegate discretionary power to legislate in a particular area exclusively to a local governing body, precluding legislation through initiative or referendum. "The presumption in favor of the right of initiative is rebuttable upon a definite indication that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right. [Citations.] Accordingly, [the Supreme Court has] concluded that the initiative and referendum power could not be used in areas in which the local legislative body's discretion was largely preempted by statutory mandate. (See *Simpson v. Hite* [(1950)] 36 Cal.2d 125, 133–134 [222 P.2d 225] [initiative or referendum power cannot be used to interfere with board of supervisor's duty to provide suitable accommodations for courts]; *Housing Authority v. Superior Court* (1950) 35 Cal.2d 550, 557–558 [219 P.2d 457]

---

[17] California Constitution, article II, section 11, subdivision (a) provides: "Initiative and referendum powers may be exercised by the electors of each city and county under procedures that the Legislature shall provide. . . ."

[18] *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 776–777 [35 Cal.Rptr.2d 814, 884 P.2d 645] (legislative intent to bar the referendum power was unmistakable because statute stated actions taken under it were to go into effect immediately).

[19] *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775–776 [38 Cal.Rptr.2d 699, 889 P.2d 1019], quoting *Associated Home Builders etc. Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473].

[local governing body's contract with local housing authority is an administrative act under state and federal public housing law and therefore not subject to referendum].)"[20]

In *Committee of Seven Thousand v. Superior Court,*[21] the California Supreme Court addressed the question whether, and under what circumstances, a statutory reference to action by a local legislative body indicates a legislative intent to preclude action on the same subject by initiative. The case involved a statute which permitted the County of Orange and cities within Orange County to adopt programs imposing major development and bridge fees to fund construction of major thoroughfares in the county.[22] As enacted, the enabling statute stated, " '[t]he *board of supervisors* of the County of Orange and the *city council* of any city in that county may, by ordinance, require the payment of a fee . . . for purposes of defraying the actual or estimated cost of . . . constructing major thoroughfares.' "[23]

The Orange County Board of Supervisors, the Irvine City Council, and other governing bodies within the area, adopted such fee programs. An unincorporated nonprofit association of residents and electors of the City of Irvine—the Committee of Seven Thousand—organized for the purpose of qualifying an initiative measure. The initiative, in essence, would have prohibited the Irvine City Council from imposing or collecting any fee or tax to fund construction of thoroughfares except by an affirmative vote of a majority of the qualified electors of the city in a regular or special election.[24]

The court reviewed earlier decisions and adopted guidelines for determining when the legislative intent to delegate exclusive authority to the local governing bodies is present. ▪ In general, those factors are whether the Legislature used general or specific language in describing the governing body in the statute at issue, and whether the subject matter of the statute involves a strictly municipal affair or involves a matter of statewide concern. The court explained: "Over the years this court has struggled with the question whether a statutory reference to action by a local legislative body indicates a legislative intent to preclude action on the same subject by the electorate. A review of these decisions supports the conclusion that while such references are generally not conclusive as to legislative intent, they do support an inference that the intent was to preclude action by initiative or

---

[20] *DeVita v. County of Napa, supra,* 9 Cal.4th 763, 776.

[21] *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491 [247 Cal.Rptr. 362, 754 P.2d 708].

[22] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 496.

[23] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 501, italics added by court.

[24] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 498.

referendum. Review of the case law further suggests that the strength of the inference varies according to the precise language used in the statute, a reference using generic language such as 'governing body' or 'legislative body' supporting a weaker inference than a specific reference to boards of supervisors and city councils. A third conclusion to be drawn is that an intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair."[25]

Applying these guidelines, the court found the Legislature's use of the terms "board of supervisors" and "city council" in the statute provided a "strong inference" action by initiative was barred.[26]

The court next considered whether the subject matter involved a municipal affair or involved a matter of statewide concern. The court defined the term "statewide" in this context to mean a reference "to all matters of more than local concern and thus includes matters the impact of which is primarily regional rather than truly statewide."[27] The court observed construction of major highways had effects beyond municipal boundaries because they were to be used primarily "for travel between cities rather than within cities."[28] The court noted the statewide character could also be inferred "from the nature of the facilities themselves," because no single city could efficiently plan and build additions to a regional highway system alone.[29] Because the contemplated highways were necessarily regional, the court noted there would likely be "substantial impacts on persons living outside the boundaries of the city and so are matters of statewide concern."[30]

The Legislature's use of the specific terms "board of supervisors" and "city council," and the subject matter of the statute involving a matter of statewide concern, combined to convince the court the Legislature intended the discretionary authority delegated by the statute "be exercised by the local legislative bodies specifically and exclusively, thereby precluding use of the initiative and referendum in this limited area."[31]

---

[25] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 501.

[26] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 505.

[27] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 505.

[28] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 506.

[29] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 506.

[30] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 506; see also, *DeVita v. County of Napa, supra,* 9 Cal.4th 763, 780 ("the Legislature's constitutional authority to restrict the local right of initiative or referendum generally derives from its partial preemption of local government authority pursuant to the fulfillment of a state mandate or objective. [Citations.] Only in matters that transcend local concerns can the Legislature have intended to convert the city and county governing bodies into its exclusive agents for the achievement of a 'legislative purpose of statewide import.' [Citation.]").

[31] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 512.

In some cases, exclusive delegation was inferred in part on the ground the Legislature must have intended to prevent disruption of routine operations of government. The decision in *Bagley v. City of Manhattan Beach*[32] is one such case. *Bagley* involved a statute specifying, "By resolution or ordinance, the city council shall fix the compensation of all appointive officers and employees."[33] A proposed initiative measure provided any and all unresolved disputes between the city and a recognized firemen's employee organization should be submitted to binding arbitration. The city refused to place the measure on the ballot and the initiative's proponents sought a writ of mandate to compel the city to place the measure on the ballot.[34] The Supreme Court affirmed the lower courts' rulings refusing relief, finding the city council had no power to delegate its statutory duty to fix compensation in any event. "When the Legislature has made clear its intent that one public body or official is to exercise a specified discretionary power, the power is in the nature of a public trust and may not be exercised by others in the absence of statutory authorization. [Citations.]"[35]

*Citizens for Jobs and the Economy v. County of Orange*[36] presents another such example. The voters passed a county initiative which placed spending and procedural restrictions on the county board of supervisors regarding the planning and implementation process for specified projects, including the conversion to civilian use of the Marine Corps Air Station at El Toro. The Court of Appeal held the initiative was beyond the power of the electorate because it interfered with essential government functions of fiscal planning and land use, interfered with the county's administrative actions, and in addition, was unconstitutionally vague.[37]

In other cases, exclusive delegation has been inferred as a means of promoting a particular regional project or intergovernmental relationship. The decision in *Committee of Seven Thousand* is an example of this type of case. The decision in *Riedman v. Brison* is another example.[38] In *Riedman,* the Supreme Court found the Metropolitan Water District Act and its procedures

---

[32] *Bagley v. City of Manhattan Beach* (1976) 18 Cal.3d 22 [132 Cal.Rptr. 668, 553 P.2d 1140].

[33] *Bagley v. City of Manhattan Beach, supra,* 18 Cal.3d 22, 24.

[34] *Bagley v. City of Manhattan Beach, supra,* 18 Cal.3d 22, 24.

[35] *Bagley v. City of Manhattan Beach, supra,* 18 Cal.3d 22, 24–25.

[36] *Citizens for Jobs and the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311 [115 Cal.Rptr.2d 90].

[37] *Citizens for Jobs and the Economy v. County of Orange, supra,* 94 Cal.App.4th 1311, 1324.

[38] *Riedman v. Brison* (1933) 217 Cal. 383 [18 P.2d 947].

by definition concerned regional matters. This fact, and the statutory reference in the act to the "governing body," combined to persuade the court an initiative to withdraw a city from the water district was barred.[39]

We turn now to the case before us. ■ Public Utilities Code section 21661.6 specifically refers to the "board of supervisors" and to the "city council" as the governing bodies responsible for decisions regarding any expansion or enlargement of an existing public airport. Use of these specific terms rather than the generic terms of "governing body" or "legislative body" creates a strong inference the Legislature intended to preclude action regarding airport expansion or relocation by initiative or referendum.

■ This inference is strengthened because the statute addresses a matter of statewide concern rather than a purely municipal matter. The Burbank-Glendale-Pasadena Airport is, by definition, regional in nature. It is not designed for travel within Burbank, but for travel between cities, regions, and indeed states. The airport does not only serve the traveling public from the cities of Burbank, Glendale and Pasadena. It is also the most convenient airport for many other members of the traveling public who reside in the greater Los Angeles County area and beyond. Its size, facilities and passenger accommodations thus affect persons and regions well beyond Burbank's borders.

The regional nature of the airport is also apparent in the types of carriers it serves. At present, the Burbank-Glendale-Pasadena airport handles flights for the carriers Alaska Airlines, Aloha Airlines, American Airlines, American West Airlines, Southwest Airlines and United Airlines. Some of these carriers are not only regional, but also national in scope. For this reason, the airport not only accommodates inbound and outbound passengers from the region but must also accommodate passengers from potentially all over the world. In this sense, construction and growth at this airport is "truly" a matter of statewide concern.[40] The Legislature's expressed goal of encouraging and developing a statewide system of regional airports further indicates growth or relocation of this regional airport has statewide import.

■ We also note the airport is not even physically contained within the City of Burbank. Although most of the airport's facilities are located in Burbank, some are located in the City of Los Angeles and thus affect that city as well. The question whether and how to expand or enlarge this regional airport, located in multiple jurisdictions, will necessarily affect persons and political subdivisions well beyond the city's boundaries. Accordingly, the

---

[39] *Riedman v. Brison, supra,* 217 Cal. 383, 387.
[40] *Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d 491, 505.

subject matter of the statute regarding construction to expand or enlarge the airport cannot be a strictly municipal affair.[41]

In short, the Legislature's insertion of a specific reference to city councils in Public Utilities Code section 21661.6 is evidence of intent to confer authority specifically and exclusively on the city council on matters of airport expansion or relocation. This evidence of legislative intent and the fact the subject matter creates significant regional impacts in this case convince us the statute relates to a matter of statewide concern, thus precluding initiative measures on the subject.

Nolan correctly observes initiative measures may be used to enact or amend zoning ordinances. He also notes adoption and amendment of a general plan may be the subject of initiative or referendum even though Government Code section 65356 confers these powers on the "legislative body."[42] Accordingly, Nolan asserts Measure A is merely a zoning ordinance to which airports are subject.

We agree airports are subject to local zoning ordinances.[43] However, we have already concluded the subject at issue in this case presents a matter of statewide concern, unlike a zoning ordinance affecting only the municipality's interest. Moreover, the cases Nolan relies on are inapposite. Each in fact involved a local zoning ordinance or local general plan measure adopted by initiative or referendum—matters traditionally deemed to be municipal affairs.[44]

Nolan next argues even if Measure A is invalid as an initiative measure the fact should be of no consequence because he claims Burbank already gave up

---

[41] See *Wilson v. City of San Bernardino* (1960) 186 Cal.App.2d 603, 611 [9 Cal.Rptr. 431] ("when a general law of the state, adopted by the state Legislature, provides for a scheme of public improvement, the scope of which intrudes upon or transcends the boundary of one or several municipalities, together with unincorporated territory, such contemplated improvement ceases to be a municipal affair and comes within the proper domain and regulation of the general laws of the state").

[42] *DeVita v. County of Napa, supra*, 9 Cal.4th 763, 776 (initiative to amend county's general plan to preserve agricultural land upheld); *Yost v. Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152] (referendum on general plan amendment upheld); *Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565] (zoning initiative in general law city valid); *Associated Home Builders etc., Inc. v. City of Livermore, supra*, 18 Cal.3d 582 (zoning ordinance proper subject matter for initiative measure); *Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565 [63 Cal.Rptr.2d 148] (portion of initiative amending general plan and zoning ordinance valid).

[43] *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra*, 72 Cal.App.4th 366, 375 ("Local agencies created under state law must comply with the City's building and zoning ordinances").

[44] In discussing most of these decisions, the Supreme Court in *Committee of Seven Thousand v. Superior Court, supra*, 45 Cal.3d 491, commented, "in all these cases the statutes

its discretionary powers over airport growth issues. Years earlier the voters adopted Measure B, which apparently mandates voter approval of Burbank City Council decisions to relocate or expand the airport terminal. Nolan claims by ceding to the voters the right to pass on the Burbank City Council's exercise of its rights conferred on it by Public Utilities Code section 21661.6, Burbank already delegated its exclusive statutory authority to the voters.[45]

The validity of Measure B was not before the trial court. Any issues regarding Measure B are necessarily not before this court either. We accordingly have no occasion to pass on the wisdom or validity of this initiative measure and decline any invitation to do so here.

■  The overriding purpose of Measure A is to impose procedural hurdles and specific restrictions on expanding or enlarging the airport directly, as well as indirectly through the conditions it sought to impose on Burbank and the Airport Authority. We have concluded in enacting Public Utilities Code section 21661.6 the Legislature intended the authority it delegated be exercised by the city council in this case specifically and exclusively, precluding use of an initiative in this area. This conclusion makes it unnecessary to consider other grounds relied on by the trial court to find Measure A invalid.

## III.  NOLAN'S PROCEDURAL CHALLENGES TO THE ACTION HAVE NO MERIT

Code of Civil Procedure section 1060 authorizes actions for a declaratory judgment and provides: "Any person . . . who desires a declaration of his or her rights or duties with respect to another, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties in the premises . . . ." Under this section, a municipality is considered a person for purposes of seeking declaratory relief.[46]

Nolan contends the trial court erred in overruling the Airport Authority's demurrer, claiming there was no actual controversy between Burbank and the Airport Authority and thus this action for declaratory relief should have been dismissed.

---

dealt with purely local concerns and, as we have noted, the term 'legislative body' is more easily read as including the electorate than the terms 'city council' or 'board of supervisors.' " (*Id.* at pp. 504–505.)

[45] But see *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra,* 72 Cal.App.4th 366, 376–377.

[46] *Hoyt v. Board of Civil Service Commissioners of the City of Los Angeles* (1942) 21 Cal.2d 399, 404 [132 P.2d 804].

The trial court's determination whether declaratory relief should be granted will not be disturbed on appeal in the absence of a clear showing of an abuse of discretion.[47]

Declaratory relief is appropriate where there is a justiciable controversy, but not where the dispute is moot, or only hypothetical or academic.[48] Contrary to Nolan's argument, an actual justiciable controversy may exist even though the parties are not antagonistic, and in fact desire the same result. For example, in *Golden Gate Bridge and Highway Dist. v. Felt*,[49] the secretary of the board of directors of the Golden Gate Bridge and Highway District refused to sign bonds proposed to be issued by the district, believing them invalid. It was a friendly suit because the secretary's and the district's views were aligned.[50] A declaratory relief action was nevertheless appropriate because any action he took prior to a judicial declaration of the bonds' validity exposed the secretary to liability. In finding the action for declaratory relief proper, the court observed, "[i]f respondent's contention is sound, and he were forced to sign, he would be acting in violation of his public duty, and assisting in the deception of prospective purchasers of the bonds. He is not bound to take a step which might conceivably involve a personal liability on his part in the event of a subsequent judicial declaration of unconstitutionality of the act, or falsity of the recitals in the bonds."[51]

Similarly in the case at bar, the trial court correctly found an actual controversy existed. If Burbank enforced Measure A's provisions by refusing to issue permits and give its consent to proposed airport projects until the Airport Authority proved it had complied with all the preconditions in Measure A, the Airport Authority would have brought suit against Burbank. Indeed, the day after the election the president of the Airport Authority wrote to warn the mayor, "The City faces potentially significant liability in damages and attorneys fees to land owners and businesses whose rights would be adversely affected if the measure is enforced." On the other hand, if Burbank refused to implement Measure A without first receiving a judicial ruling on the measure's validity, proponents of the measure would likely have sued the City of Burbank had the city not brought its own suit as quickly as it did. As

---

[47] *Auberry Union School Dist. v. Rafferty* (1964) 226 Cal.App.2d 599, 602 [38 Cal.Rptr. 223].

[48] *Auberry Union School Dist. v. Rafferty, supra*, 226 Cal.App.2d 599, 603.

[49] *Golden Gate Bridge and Highway Dist. v. Felt* (1931) 214 Cal. 308 [5 P.2d 585].

[50] *Golden Gate Bridge and Highway Dist. v. Felt, supra*, 214 Cal. 308, 316 ("It is conceded that respondent secretary is personally desirous of a decision in favor of petitioner. In other words, this is a friendly suit").

[51] *Golden Gate Bridge and Highway Dist. v. Felt, supra*, 214 Cal. 308, 317; see also *City and County of San Francisco v. Boyd* (1943) 22 Cal.2d 685, 694–695 [140 P.2d 666] ("A suit is not condemned by law merely because it is friendly").

it is, Nolan's presence in the lawsuit, as an intervener and a principal proponent of Measure A, provides the requisite adversity.

Next Nolan argues Burbank lacked standing to challenge one of its duly passed laws. He contends if Burbank wanted to challenge Measure A it was bound to do so prior to the election. Now Measure A has been adopted by the electorate, Nolan contends Burbank must enforce, and is forever precluded from challenging, one of its existing laws. In support of his argument Nolan relies on Election Code section 9217 and the decisions in *Proposition 103 Enforcement Project v. Quackenbush*,[52] *Mobilepark West Homeowners Association v. Escondido Mobilepark West*[53] and other cases for the proposition an initiative, once passed, cannot be "repealed or amended except by a vote of the people."[54]

Nolan's authority is not on point. This action is not one to amend or repeal Measure A. It is instead an action seeking a judicial determination of the measure's validity in the first instance. Unlike the situations in Nolan's cited authorities, Burbank did not pass legislation which had the effect of either amending or repealing Measure A.

Nor is Burbank bound to enforce Measure A simply because it chose not to make a preelection challenge to its validity. Nolan cites no authority to support this particular contention. Court challenges both preelection and postadoption have been held to be appropriate.[55] Although preelection challenges are not uncommon, it is equally appropriate to permit the measure to be placed on the ballot and then to seek review of its validity postelection.[56] Indeed, in *Brosnahan v. Eu*,[57] our Supreme Court observed, "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the

---

[52] *Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1483–1484 [76 Cal.Rptr.2d 342] ("When a statute enacted by the initiative process is involved, the Legislature may amend it only if the voters specifically gave the Legislature that power, and then only upon whatever conditions the voters attached to the Legislature's amendatory powers").

[53] *Mobilepark West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 40–41 [41 Cal.Rptr.2d 393].

[54] Elections Code section 9217.

[55] See, e.g., *City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 874 [30 Cal.Rptr.2d 797] (city has standing to make a preelection challenge to a proposed referendum).

[56] See *Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013, 1022 [2 Cal.Rptr.2d 648] ("postelection review—assuming that the measure in question passes—is certainly *preferable*," italics added).

[57] *Brosnahan v. Eu* (1982) 31 Cal.3d 1 [181 Cal.Rptr. 100, 641 P.2d 200].

electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity."[58]

In sum, Nolan's procedural challenges are not well taken.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to Burbank.

Woods, J., and Zelon, J., concurred.

---

[58] *Brosnahan v. Eu, supra*, 31 Cal.3d 1, 4.

# APPENDIX

TEXT OF MEASURE A:

*THE INITIATIVE TO RESTORE OUR AIRPORT RIGHTS*

*An Initiative Measure To Be Submitted Directly To The Voters*

1. For the purposes of this initiative "City" shall be defined as the City of Burbank, and "Airport" shall be defined as any airport located in whole or in part within the City. An "aircraft operation" is the takeoff or landing of an aircraft. The definition of other words in this initiative are those found in the Random House Webster's College Dictionary, 1995 edition.

2. The terms and conditions of this initiative shall not apply to police, fire, military or emergency flights. Curfew violations need not apply to delays caused by inclement weather or mechanical emergencies incurred while in flight.

3. The City shall obtain the consent of the electorate, with a 2/3 affirmative vote, prior to the City's final approval of the financing and/or construction of an airport terminal.

4. The City shall not consent to the acquisition or rezoning of any land for Airport use, nor consent to the financing or construction of any new, rebuilt, relocated or expanded Airport facility, under any conditions or due to any circumstances, unless and until the Airport has complied with all the following conditions:

a. The Airport has implemented a legally obtained, irrevocable, enforceable, and binding mandatory curfew on all aircraft operations and engine run-ups, either indoors or outdoors, between the hours of 10:00 P.M. and 7:00 A.M.

b. The Airport has legally established the maximum annual number of aircraft operations, at the Airport, to be capped at no more than 10 percent above the number of aircraft operations at the Airport during the calendar year 2000.

c. The Airport has legally established the maximum annual number of aircraft passengers, at the Airport, to be capped at no more than 10 percent above the number of aircraft passengers at the Airport during the calendar year 2000.

d. The Airport has implemented rules to enforce the curfew and caps. Fines and other sanctions, including, but not limited to, prohibiting Airport use, shall be imposed on violators of the curfew and caps.

e. The Airport has implemented a legally obtained ban on operations by all aircraft not originally manufactured and certified as meeting FAR Part 36 Stage 3 noise limits.

f. The Airport shall have a program for sound insulation that includes providing the matching funds required for completion of the work.

g. The Airport shall not impose an Aviation Easement on property as a condition for sound insulation.

h. The Airport shall prepare and certify a new Environmental Impact Report for property it owns, leases or uses for Airport or Airport related purposes.

i. The Airport shall prepare a Master Plan for all Airport property, and obtain the City's approval of the Master Plan.

j. The Airport agrees to not lengthen existing runways, add additional runways, or modify runways to accommodate heavier or larger aircraft.

k. The Airport has established a legal means to acquire the money and pay the City a fine of $5,000.00, adjusted annually for inflation, for each day of each violation of this initiative. The fine shall be paid within 30 days of the violation. The airport shall pay all costs of enforcement and collection related to this provision.

l. The Airport agrees, to the maximum extent the law allows, to reimburse the City for lost property tax revenues, and for the Airport's fair share of all costs related to infrastructure improvement and maintenance.

5. The City shall vigorously enforce all provisions of this initiative, as well as its rights under any Joint Powers Agreement. The City Council shall designate a City Department, whose duty it shall be, upon receiving written notice alleging a violation, to promptly investigate the complaint, and file reports with all appropriate authorities, so as to insure the Airport's compliance with this initiative.

6. The City shall provide independent noise monitoring of aircraft activity in the City. If necessary, the City shall hire a consultant, competent in noise measurement, and whose expertise will provide the basis for enforcement of this initiative in Court.

7. This initiative shall not be modified, except by a 2/3 affirmative vote of the electorate at a regular Municipal election.

8. The City shall conform all applicable laws to this initiative. Until the City has done so, any laws that would be affected by this initiative shall be deemed to have been conformed so as not to be in conflict with this initiative or the 2/3 vote requirements of this initiative.

9. If any of the provisions of this initiative or the applicability of any provision of this initiative to any person or circumstances shall be found to be unconstitutional or otherwise invalid, such finding shall not affect the remaining provisions or applications of this initiative to other persons or circumstances, and to that extent the provisions of this initiative are deemed to be severable.