164 Cal.App.4th 671 (2008)
SUNSET SKYRANCH PILOTS ASSOCIATION et al., Plaintiffs and Appellants,
v.
COUNTY OF SACRAMENTO et al., Defendants and Respondents;
JOHN M. TAYLOR et al., Real Parties in Interest and Respondents.
No. C055224.
Court of Appeals of California, Third Dist.
July 2, 2008.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*676 Law Office of Lanny T. Winberry and Lanny T. Winberry for Plaintiffs and Appellants.
Robert A. Ryan, County Counsel, and Krista C. Whitman, Deputy County Counsel, for Defendants and Respondents.
Taylor & Wiley, John M. Taylor, Kate Leary Wheatley and Matthew S. Keasling for Real Parties in Interest and Respondents.

OPINION
SIMS, Acting P. J.
This appeal challenges a county's zoning decision to deny renewal of a conditional use permit (CUP) needed for continued operation of a privately owned, public-use airportthe Sunset Skyranch Airport. Appellants Sunset Skyranch Pilots Association and Daniel Lang (collectively, the Airport) appeal from a judgment denying their petition for writ of mandate and complaint for injunctive relief and monetary damages, against the County of Sacramento and its board of supervisors (collectively, the County). Real parties in interest, John Taylor and Taylor and Wiley, represent property owners developing properties north of the airport and are aligned with the County as respondents in this appeal.
The Airport contends the County's denial of the CUP renewal (which was upheld by the trial court on the ground the Airport was hindering acquisition of a site for construction of an elementary school) was preempted by the State Aeronautics Act (Pub. Util. Code, § 21001 et seq. (SAA)).[1] The Airport maintains the SAA prevents the County from exercising its zoning powers in a way that will result in closure of a public-use airport, as long as the airport has a state permit under the SAA and complies with conditions of the County's CUP. The Airport also contends the County's decision violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)), was unsupported by substantial evidence (because of the claimed preemption), and results in an unconstitutional regulatory taking of private property without just compensation.
(1) In the published portions of the opinion, we shall address two points. First, we shall conclude the SAA focuses on safety standards and controlled development of airports and, while its stated purpose is to encourage aviation, it does not compel the County to allow continued operation of the *677 airport. We shall therefore conclude the County's decision is not preempted by or contrary to the SAA. Second, we shall conclude the denial of CUP renewal, because it will result in closure of the airport, is a CEQA project requiring an initial study under CEQA. In the unpublished portion of the opinion, we reject the Airport's other contentions. We shall reverse the judgment on the CEQA ground alone.

BASICS OF THE SAA
The SAA defines "aeronautics" as "(a) The science and art of flight, including transportation by aircraft. [¶] (b) The operation, construction, repair, or maintenance of aircraft and aircraft power plants and accessories, including the repair, packing, and maintenance of parachutes. [¶] (c) The design, establishment, construction, extension, operation, improvement, repair, or maintenance of airports or other air navigation facilities." (§ 21011.)
The SAA requires a state permit from the Department of Transportation (the Department) in order to operate an airport. (§§ 21663 [no person shall operate an airport unless the Department has issued a permit], 21006.5). The state permit assures that onsite and offsite safety standards are met. (§ 21666.)[2] The Department has authority to impose conditions on the state permit (§ 21666) or revoke the state permit for specified reasons, such as abandonment of the airport, failure to comply with conditions, or change in physical or legal conditions on or off the airport site such that the site may no longer be safely used by the general public (§ 21668).[3]
The SAA states its purpose is "to further and protect the public interest in aeronautics and aeronautical progress by the following means:
"(a) Encouraging the development of private flying and the general use of air transportation.
"(b) Fostering and promoting safety in aeronautics.
"(c) Effecting uniformity of the laws and regulations relating to aeronautics consistent with federal aeronautics laws and regulations.
"(d) Granting to a state agency powers, and imposing upon it duties, so that the state may properly perform its functions relative to aeronautics and *678 effectively exercise its jurisdiction over persons and property, assist in the development of a statewide system of airports, encourage the flow of private capital into aviation facilities, and cooperate with and assist political subdivisions and others engaged in aeronautics in the development and encouragement of aeronautics.
"(e) Establishing only those regulations which are essential and clearly within the scope of the authority granted by the Legislature, in order that persons may engage in every phase of aeronautics with the least possible restriction consistent with the safety and the rights of others.
"(f) Providing for cooperation with the federal authorities in the development of a national system of civil aviation . . . .
"(g) Assuring that persons residing in the vicinity of airports are protected to the greatest possible extent against intrusions by unreasonable levels of aircraft noise." (§ 21002.)
The SAA also establishes airport land use commissions (commission or ALUC), in section 21670, as follows:
"(a) The Legislature hereby finds and declares that:
"(1) It is in the public interest to provide for the orderly development of each public-use airport in this state and the area surrounding these airports so as to promote the overall goals and objectives of the California airport noise standards adopted pursuant to Section 21669 and to prevent the creation of new noise and safety problems.
"(2) It is the purpose of this article to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses.
"(b) In order to achieve the purposes of this article, every county in which there is located an airport which is served by a scheduled airline shall establish an [ALUC]. Every county, in which there is located an airport which is not served by a scheduled airline, but is operated for the benefit of the general public, shall establish an [ALUC], except that the board of supervisors of the county may, after consultation with the appropriate airport operators and affected local entities and after a public hearing, adopt a resolution finding that there are no noise, public safety, or land use issues affecting any airport in the county which require the creation of a commission *679 and declaring the county exempt from that requirement." (§ 21670.) Special districts and school districts are among the local agencies that are subject to airport land use laws and other requirements of the SAA. (§ 21670, subd. (f).)
Each commission is made up of seven members: Two persons representing the cities in the county, appointed by a committee comprised of the mayors of all the cities within that county, except that if there are any cities contiguous or adjacent to the qualifying airport, at least one representative therefrom; two persons representing the county, appointed by the board of supervisors; two persons with aviation expertise, appointed by a selection committee comprised of the managers of all public airports within that county; and one person representing the general public, appointed by the other six members of the commission. (§ 21670, subd. (b).)
Section 21674[4] gives the commission the authority to "assist" local agencies in ensuring compatible land uses and to review local agency plans, but it also states (1) the commission does not have jurisdiction "over the operation of any airport" (§ 21674, subd. (e)), and (2) the commission's powers are subject to section 21676,[5] which specifies that local agencies may "overrule" the commission by a two-thirds vote if they find their plan is consistent with the purposes of the SAA.
The commission formulates an airport land use compatibility plan (ALUCP) "that will provide for the orderly growth of each public airport and the area surrounding the airport within the jurisdiction of the commission, and will safeguard the general welfare of the inhabitants within the vicinity of the airport and the public in general." (§ 21675, subd. (a).)
*680 The County's general plan, and any specific plan, must be consistent with the ALUCP, but the County may overrule a commission finding of inconsistency by making its own finding of consistency with a two-thirds vote. (§ 21676; fn. 5, ante; Gov. Code, § 65302.3.)[6]
Each local agency whose general plan includes areas covered by an ALUCP was required to submit its plan to the commission in 1983, and continues to be required to submit proposed amendments to the commission. (§ 21676.) The commission determines whether the plan is consistent with the ALUCP and notifies the local agency of any inconsistency. (§ 21676.) However, the local agency may "overrule" the commission by a two-thirds vote of the local governing body if it makes a specific finding that the plan or amendment is consistent with the purposes of the SAA as stated in section 21670. (§ 21676, subds. (a), (b), (c).) In 2003, statutory amendments to section 21676 added provisions that the local agency must advise the commission of its proposed findings and accept comments from the commission, but "[t]he comments by the division or the commission are advisory to the local agency governing body." (§ 21676, subds. (a), (b), (c).)
Under the SAA, construction plans for new airports and public-entity acquisition of land for expansion of publicly owned airports (matters not at issue here) must be approved by the city or county before being submitted to the Department for a state permit. (§§ 21661.5, 21661.6.)
The SAA states it "shall not be construed as limiting any power of the state or a political subdivision to regulate airport hazards by zoning." (§ 21005.) We do not read this provision as dispositive of this case, because the term "airport hazards" means "any structure, object of natural growth, or use of land, which obstructs the air space required for flight of aircraft in landing or taking off at an airport or which is otherwise hazardous to the landing or taking off." (§ 21017.) Airport hazards are also addressed in other statutes (§ 21652 et seq. (Hazard Elimination; Flight Disturbance); Gov. Code, § 50485 et seq. (Airport Approaches Zoning Law)), with Government Code section 50485.14 expressly stating the absence of any intent to deny local zoning powers. As we shall see, this case does not involve hazards dangerous to landing and taking off. Thus, the SAA provisions regarding airport hazards do not resolve this case.
*681 With this statutory background in mind, we next set forth the background of this litigation.

FACTUAL AND PROCEDURAL BACKGROUND
This appeal involves the County's denial of the Airport's May 2004 application for renewal of the CUP.
The following facts are taken primarily from the County's administrative findings and our unpublished opinion in a prior case involving this airport, Lang v. Board of Zoning Appeals (Nov. 4, 1993, C013642) (nonpub. opn.).
The airport has been operating at some level of activity for many years. A prior owner of the land began operating an airstrip in 1934, when there were no zoning regulations.
In 1962, Sacramento County Zoning Ordinance No. 739 permitted in that zone "[a]irports and aircraft landing fields authorized by the State of California Aeronautics Commission provided such uses conform to the General Plan of the County of Sacramento." In 1963, the zoning was changed to AG-20 and AG-20(F). In 1968, Sacramento County Zoning Ordinance No. 799 permitted the operation of airports subject to issuance of a CUP.
In 1971, appellant Lang acquired the property and applied for a CUP for a private-use airstrip and a public-use airport. The County granted him a two-year CUP to operate a private-use airport. At the time the 1971 CUP issued, the main purpose of the airport was for agricultural flight operations; the surrounding land uses were predominantly agricultural; Elk Grove had a population of just over 5,000; and the nearest residential neighborhood was miles away from the airport.
In 1972, the Sacramento County Planning Commission approved a change in the County general plan to allow a public-use airport at that location.
Also in 1972, pursuant to the SAA, Lang obtained from the Department a state airport permit (state permit) for a public-use airport. The Airport continues to have a valid state permit.
In 1973, the 1971 CUP expired by its own terms. Lang did not request renewal of the CUP but continued the airport operations. He obtained business licenses authorizing his commercial stable and airstrip. The land was rezoned AG-80, a zone in which airports are permitted with CUP's.
In 1988, pursuant to the SAA, the ALUC for the subject area (the Sacramento Area Council of Governments) adopted an ALUCP for the airport *682 to "provide for the orderly growth" of the airport and "the area surrounding" it during "at least the next 20 years" (i.e., 2008).
In 1989, the County treasurer-tax collector denied Lang's application for renewal of his business license on the ground of insufficient information to show compliance with the Zoning Code of Sacramento County. Lang appealed the denial of the business license and applied for a certificate of nonconforming use. The County denied the nonconforming use due to "considerable expansion" of the airstrip, upheld denial of the business license, and recommended that Lang obtain a CUP. The dispute ended up in this court, and in November 1993, we issued the unpublished opinion in Lang v. Board of Zoning Appeals, supra, C013642. We concluded the airport's expansion had extinguished its status as a nonconforming use. The original airstrip for crop dusters (with a dirt strip, one hangar, and four or five airplanes), had developed into a public-use airport with two runways, 14 hangars, and 65 aircraft. We held the Airport needed a CUP to operate.
The Airport subsequently applied for a CUP in 1999 (after having operated without a CUP between 1973 and 1999).
On October 6, 1999, the County granted a five-year CUP. Although the airport had requested a 10-year CUP, the County gave only a five-year CUP, anticipating that an East Elk Grove Specific Plan, approved by the County in 1996, might lead to urbanization of the area, rendering the airport an incompatible use. The CUP expressly imposed a condition that "[t]he airport operator shall inform all airplane owners with tie-downs who intend to install or improve airport hangars on the property of the terms of this use permit, including the expiration date." (Italics added.) The County approved a negative declaration under CEQA, that the CUP would not have a significant effect on the environmenta decision that was upheld in Fat v. County of Sacramento (2002) 97 Cal.App.4th 1270 [119 Cal.Rptr.2d 402].
Next comes the 2004 CUP renewal application which is the subject of this appeal. On September 22, 2004 (before expiration of the 1999 CUP on Oct. 6, 2004), the pilots association applied for renewal of the 1999 CUP. The Department's aeronautics division submitted a letter stating in part, "We support continued operations at [the Airport]."
The Sacramento County Zoning Code, sections 201-02 and 201-04, allows, as a permitted use, a public-use airport in the zone where the Airport is located, "subject to issuance of a conditional use permit by the appropriate authority." Airports as a permitted use are also subject to the "special condition" as follows: "Permitted if approved in writing by the State of California Aeronautics Department and the Federal Aviation Administration; *683 copies of said approvals to be submitted to the Director of the Planning and Community Development Department." (Sacramento County Zoning Code, §§ 230-11, 230-13.) As indicated, the Airport has a state permit.
Sacramento County Code, section 2.34.020 states the county's zoning administrator "shall hear and decide applications for . . . conditional use permits," and section 2.34.030 states the zoning administrator "shall adopt such rules and procedures which the administrator deems necessary or convenient to perform the duties of the office."
On November 17, 2004 (after the Oct. 2004 expiration of the 1999 CUP), a planning advisory council recommended approval of the CUP renewal. Planning department staff subsequently recommended denial of the renewal request on the basis that the land uses in the surrounding area were changing, thereby creating a situation where the airport was no longer a compatible use.
On July 25, 2005, the project planning commission voted to approve renewal of the CUP for a two-year period, with the understanding that no further extensions would be granted. Real parties in interest (representing the neighboring property owners) filed an administrative appeal to the county board of supervisors.
After an administrative hearing, the board of supervisors, by a vote of four to one, denied renewal of the CUP by voting to uphold the appeal, overturn the planning commission decision, and adopt "FINDINGS REGARDING THE SUNSET SKYRANCH USE PERMIT DENIAL." The Board's findings summarize: "The action taken by the Board of Supervisors is not a revocation of an existing use permit but, rather, merely a decision not to renew a use that has already expired. It accordingly reflects a decision to not re-grant [sic] a permit for a use that has been determined to no longer be compatible with its surroundings. Furthermore, [CEQA] does not require that environmental analysis be conducted before an agency denies a project since a denial does not constitute a project for the purposes of CEQA."
The County found:
"1. The renewal request is incompatible with the existence of the many new residential neighborhoods which have been constructed pursuant to the East Elk Grove Specific Plan.
"2. The Elk Grove Unified School District is experiencing difficulty locating a school site within the East Elk Grove Specific Plan area, south of Elk Grove Boulevard, due to the presence of the Airport. The Elk Grove Unified School District designated and reserved a school site within the *684 Airport overflight zone . . . based upon its expectation that the airport would be closed. Based on Caltrans School Site Evaluation Criteria and a written statement from the Elk Grove Unified School District . . . renewal of the Airport use permit will hinder the final acquisition of a site and construction of a greatly needed elementary school within the East Elk Grove Specific Plan area.
"3. The Board of Supervisors provided an adequate phase-out period with the previous five year use permit and it specifically included in that use permit the fact that renewal might not be forthcoming after the five year expiration date. The pilots have accordingly had adequate warning and time to find other alternatives, including relocation to one of the other airport facilities located within the County of Sacramento and the Lodi area.
"4. According to testimony from the [chief operating officer of the] Sacramento County Department of Airports, adequate alternative facilities with sufficient holding capacity are available in more appropriate locations throughout the County of Sacramento and in the Lodi area . . . ."
The County also found that denial of the requested CUP did not constitute any action regarding approval of future development projects which might be rendered feasible because of the elimination of the airport. The County instead stated that any future development projects, which might now become feasible because of the elimination of the restriction on residential development stemming from the comprehensive land use plan (CLUP) for the airport, would require their own environmental review before being approved.
The County also found "[a]lthough the noise contours, over-flight zone, and approach and departure zones associated with the Airport are reflected on the General Plan, those indications of the CLUP's existence do not control the General Plan and do not result in a mandate that the requested use permit be granted. Instead, they merely provide guidance to be followed when proposed land[] uses impacted by those designations are under consideration. Moreover, the Airport Land Use Commission will be requested to invalidate the CLUP to reflect the action taken to deny the use permit requested, following which all references to the invalidated CLUP will be deleted from the General Plan."
The Airport filed in the trial court a petition for writ of mandate (Code Civ. Proc., §§ 1085, 1094.5) and complaint for injunctive relief and monetary damages. The first cause of action alleged the County's decision was contrary to the purposes and express provisions of the SAA. The second count alleged the County violated CEQA by failing to conduct an analysis of the environmental impact of closing the airport. The third count sought an injunction to *685 prevent closure of the airport and argued closure would constitute an unconstitutional taking of private property without due process and without just compensation. The pleading's prayer included a request for money to compensate for the taking of the property.
Following a hearing of counsel's oral arguments and consideration of the parties' written submissions, the trial court entered a judgment denying the petition for writ of mandate and the complaint in their entirety and entering judgment in favor of the County and real parties in interest. The judgment incorporated by reference a written ruling, in which the trial court concluded (1) denial of the CUP renewal was not preempted by or violative of the SAA; and (2) denial of the CUP renewal did not constitute a "project" triggering CEQA. Over an objection that the issue was not tendered in the administrative proceedings or the petition/complaint, the trial court entertained the Airport's argument that the administrative findings were unsupported by substantial evidence. The court determined the case did not involve fundamental vested rights and therefore the court should review the administrative findings under the substantial evidence test, not the independent judgment test urged by the Airport. The trial court found no substantial evidence supported the administrative finding that the renewal request was "incompatible" with existing new residential neighborhoods (Administrative Finding No. 1). However, the trial court found substantial evidence supported the administrative finding that the Airport was hindering the acquisition and construction of an elementary school (Administrative Finding No. 2). Even though it was still possible the department of education might approve the proposed site, and even though closure of the airport would not guarantee approval of the school site, those matters went to the wisdom of the County's decision, which was beyond the purview of the court's review. As to the takings claim, the trial court determined the claim was ripe, but denial of the CUP did not result in a governmental taking of private property.
The Airport appeals.

DISCUSSION

I. Standard of Review

Although the Airport's pleading cited the statutes for both traditional mandamus and administrative mandamus (Code Civ. Proc., §§ 1085, 1094.5), it seems clear this is a case of administrative mandamus challenging an administrative decision made as a result of a proceeding in which a hearing with evidence was required, and discretion was vested in the administrative body (Code Civ. Proc., § 1094.5, subd. (a); Gov. Code, § 65901; Sacramento County Zoning Code, § 110-03).
*686 Under Code of Civil Procedure section 1094.5, subdivision (b), the inquiry extends to the questions "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."
(2) When a claim is made that administrative findings are not supported by the evidence, and the case does not involve fundamental vested rights, the court does not apply independent judgment but determines whether the findings are supported by substantial evidence in light of the whole record. (Code Civ. Proc., § 1094.5, subd. (c).) Generally, there is no fundamental vested right to renewal of a CUP.[7] (Metropolitan Outdoor Advertising Corp. v. City of Santa Ana (1994) 23 Cal.App.4th 1401 [28 Cal.Rptr.2d 664] [corporation had no fundamental vested right to continued use of a billboard, where corporation agreed to the conditions of the CUP when it was granted, including removal of billboard after permit's expiration].)
In cases not involving independent judgment by the trial court, the scope of our review "is identical with that of the superior court. The same substantial evidence applies, and the issue is whether the findings of the County . . . were based on substantial evidence in light of the entire administrative record. [Citations.]" (Desmond v. County of Contra Costa (1993) 21 Cal.App.4th 330, 334-335 [25 Cal.Rptr.2d 842].) We examine the administrative findings rather than limiting ourselves to a review of the trial court's findings. (Ibid.)
In review of an administrative mandamus case under Code of Civil Procedure section 1094.5, as in other appeals, we review questions of law de novo. (Automotive Funding Group, Inc. v. Garamendi (2003) 114 Cal.App.4th 846, 851 [7 Cal.Rptr.3d 912].) Thus, to the extent they do not involve factual disputes, we review de novo the questions of SAA preemption and CEQA applicability. We reject the County's argument that de novo review does not apply in this case due to the absence of any fundamental vested right. Vested rights affect only the review of substantial evidence claims and do not affect the general rule of appellate review that we review questions of law de novo.

*687 II. No Preemption by or Violation of SAA

The Airport contends the County's action, denying the CUP renewal that would allow continued operation of the airport, was contrary to the SAA and preempted by the SAA. The Airport's position is that the County must allow the continued operation of the airport, as long as (1) the Airport's state-issued permit remains valid and (2) the Airport abides by the reasonable conditions reflected in the CUP. We disagree.
Preliminarily, we reject the County's view that our prior unpublished Lang opinion collaterally estops the Airport from arguing preemption, or that the Airport forfeited the preemption claim by failing to preserve it when they applied for the 1999 CUP, which was granted. We did not address preemption in our prior opinion, and there was no need for the Airport to raise the preemption claim until now.
(3) Also preliminarily, we observe the limited nature of this preemption claim. Preemption addresses conflicts between legislative acts by the state and local governments. (Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."].) Although zoning ordinances are legislative acts, local decisions on CUP applications are adjudicatory in nature. (Arnel Development Co. v. City of Costa Mesa (1980) 28 Cal.3d 511, 514, 519, 523 [169 Cal.Rptr. 904, 620 P.2d 565].) The Airport does not claim that any County ordinance, or that any part of a County ordinance, conflicts with the SAA. Nor does the Airport dispute that "airports are subject to local zoning ordinances" (City of Burbank v. Burbank-Glendale-Pasadena Airport Authority (2003) 113 Cal.App.4th 465, 479 [6 Cal.Rptr.3d 367]), though the Airport notes Burbank referred to a prior case's statement that local agencies created under state law must comply with a city's zoning ordinances (a point inapplicable to the case before us). The Airport argues the County's decision to deny renewal of the Airport's CUP violates the purposes of the SAA. The Airport thus hopes to avoid the consequence that the County's action does not violate any specific SAA provision and invoke the preemption principle prohibiting a county from action "inimical" or hostile to state law. (O'Connell v. City of Stockton (2007) 41 Cal.4th 1061, 1067-1068 [63 Cal.Rptr.3d 67, 162 P.3d 583] [a conflict between state and local laws exists if the local legislation contradicts state law, i.e., is inimical to or cannot be reconciled with state law].) We treat the Airport's appeal as presenting an argument that the county zoning ordinance allowing the County the discretion to deny CUP renewal when detrimental to the general welfareis, as applied to airports, preempted by the SAA.
(4) "[T]he `general principles governing state statutory preemption of local land use regulation are well settled. "The Legislature has specified *688 certain minimum standards for local zoning regulations (Gov. Code, § 65850[8] et seq.)" even though it also "has carefully expressed its intent to retain the maximum degree of local control (see, e.g., id., §§ 65800,[9] 65802)." [Citation.]'" (Big Creek Lumber Co. v. County of Santa Cruz (2006) 38 Cal.4th 1139, 1150 [45 Cal.Rptr.3d 21, 136 P.3d 821] (Big Creek Lumber).)
(5) As indicated, California Constitution, article XI, section 7, states: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." This provision reflects an inherent police power, and a county's power to control its own land use decisions "`derives from this inherent police power, not from the delegation of authority by the state.'" (Big Creek Lumber, supra, 38 Cal.4th at p. 1151.)
(6) A conflict between state and local laws exists if the local ordinance duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication. (O'Connell v. City of Stockton, supra, 41 Cal.4th at p. 1067.) A local ordinance duplicates state law when it is coextensive with state law. (Ibid.) A local ordinance contradicts state law when it is inimical to or cannot be reconciled with state law. (Id. at p. 1068.) A local ordinance enters a field fully occupied by state law either when the Legislature expressly manifests its intent to occupy the legal area or when the Legislature impliedly occupies the field. (Ibid.)
"There can be no preemption by implication if the Legislature has expressed an intent to permit local regulation or if the statutory scheme recognizes local regulation. [Citation.]" (Delta Wetlands Properties v. County of San Joaquin (2004) 121 Cal.App.4th 128, 143 [16 Cal.Rptr.3d 672].)
(7) "The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. [Citation.] [The California Supreme Court] ha[s] been particularly `reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another.' [Citations.] `The common thread of the cases is that if there is a significant *689 local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption.' [Citation.]
"Thus, when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is not preempted by state statute. [Citation.] The presumption against preemption accords with our more general understanding that `it is not to be presumed that the [L]egislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication.' [Citations.]" (Big Creek Lumber, supra, 38 Cal.4th at pp. 1149-1150.)
Here, as indicated, the Legislature, in enacting state zoning laws governing local zoning ordinances, has declared its "intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters." (Gov. Code, § 65800; see fn. 9, ante.)
(8) The SAA does not expressly or impliedly occupy the field of airport regulation. The SAA itself expressly states that the powers of an ALUC "shall in no way be construed to give the commission jurisdiction over the operation of any airport."[10] (§ 21674, subd. (e).) Even as to matters where the commissions have jurisdiction, the SAA expressly recognizes local regulation and acknowledges the continuing role of local governments by specifying that the local entities' override of certain commission decisions must be made by a two-thirds vote and a finding by the local entity that the proposed action is consistent with the SAA. (E.g., § 21676; see fn. 5, ante [prior to amendment of general plan or specific plan, or adoption or approval of a zoning ordinance or building regulation, the local agency shall refer the proposed action to the commission].)
The Airport cites City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra, 113 Cal.App.4th at page 478, which said section 21661.6 (submission of plan for expansion or enlargement of airport) addressed "a matter of statewide concern rather than a purely municipal matter," because the airport was regional in nature, designed for travel between regions. The Burbank case held the statute's specific reference to city councils and boards of supervisors as the governing bodies responsible for decisions regarding *690 airport expansion or enlargement, created a strong inference the Legislature intended to preclude action by initiative or referendum. (113 Cal.App.4th at p. 478.) This does not help the Airport in this case.
The Airport argues the basis for preemption is that the County's action in denying the CUP renewal under its zoning ordinances is "inimical" to the SAA. The Airport also argues the County's action is "contrary to" the SAA, and the SAA protects state-permitted airports from involuntary closure by local zoning decisions as long as the airport has a state permit and complies with CUP conditions.
However, the Airport cites no specific SAA provision which is "contrary to" the County's denial of the CUP renewal. As we shall explain, the County's action is not inimical to or contrary to the SAA. Some aspects of the SAA arguably support the Airport's view that there should be some restriction on the County's ability to cause closure of an airport by denying a CUP renewal for continued operation. However, we shall conclude the SAA, as it stands, does not prevent the County from denying the CUP renewal, even if it results in closure of the airport. If the Legislature wants to impose such a restriction on a county's constitutional police powers, the Legislature must do so by clear legislation, not by circuitous implication.
(9) "[A]irports are subject to local zoning ordinances." (City of Burbank v. Burbank-Glendale-Pasadena Airport Authority, supra, 113 Cal.App.4th at p. 479.) "Local agencies created under state law [such as airport authorities] must comply with [local] building and zoning ordinances." (City of Burbank v. Burbank-Glendale-Pasadena Airport Authority (1999) 72 Cal.App.4th 366, 375 [85 Cal.Rptr.2d 28].)
(10) Although a CUP creates a property right that may not be revoked without constitutional due process (Malibu Mountains Recreation, Inc. v. County of Los Angeles (1998) 67 Cal.App.4th 359 [79 Cal.Rptr.2d 25] (Malibu Mountains Recreation); 1 Longtin's California Land Use (2008 supp.) § 3.71, p. 332), denial of an application for renewal of a CUP is not the same as revocation of a CUP. (Sunset Amusement Co. v. Board of Police Commissioners (1972) 7 Cal.3d 64, 85 [101 Cal.Rptr. 768, 496 P.2d 840]; Goat Hill Tavern v. City of Costa Mesa, supra, 6 Cal.App.4th at p. 1530.)
The Airport argues the purpose of the SAA is to protect airports from closures unless and until, in the state's assessment, the airport site no longer conforms to minimum airport standards or can no longer be safely used by the public. However, the Airport fails to support its position.
The Airport (mis)cites section 21668, which states the grounds upon which the Department may revoke the state-issued permit, i.e., if there has been an *691 abandonment of the airport or failure to comply with conditions set forth in the permit or Department regulations, or the airport no longer conforms to minimum airport standards, or the site may no longer be safely used by the general public because of a change in physical or legal conditions on or off the site. This statute says nothing about requiring counties to keep privately owned, public-use airports open. The Airport argues it qualifies for state protection because, in granting the state permit, the Department weighed the advantages to the public against the burden on the surrounding area. (§ 21666.) We see nothing protecting the airport from closure by a local land use zoning decision. We reject the Airport's reliance on a reference in Big Creek Lumber, supra, 38 Cal.4th 1139, to a provision of the California Timberland Productivity Act of 1982 (Gov. Code, § 51100 et seq.) which expressly preempted local control of parcels located in timberland production zones. (38 Cal.4th at p. 1155.)
The Airport also cites the provisions of the SAA stating the purpose to encourage aviation and to protect airports from incompatible uses in the land surrounding the airports. (§§ 21002, 21670.) However, "encouraging" something is not the same as mandating it. Moreover, those statutes appear to assume the local government wants an airport and are tempered by the SAA's express references to local powers (though placing some restrictions, such as requiring a two-thirds vote and a finding of consistency with the SAA in order for the local entity to override an ALUC).
Thus, section 21002 states the purposes of the SAA include "[e]ncouraging the development of private flying and the general use of air transportation. [¶] . . . [¶] [and] Granting to a state agency powers . . . [to] cooperate with and assist political subdivisions . . . in the development and encouragement of aeronautics." And section 21674 gives the commission the power "[t]o assist local agencies in ensuring compatible land uses . . . in the vicinity of existing airports . . . ." Neither provision requires a county to keep renewing an airport's CUP.
(11) That the SAA has the purpose to encourage the development of private flying (§ 21002) is not enough to conclude the SAA prevents a county from denying a CUP renewal that will result in closure of a privately owned airport. "When the Legislature wishes expressly to preempt all regulation of an activity, it knows how to do so." (Big Creek Lumber, supra, 38 Cal.4th at p. 1155.)
(12) The Airport cites section 21675, which states that in formulating an ALUCP, "the commission may develop height restrictions on buildings, specify use of land, and determine building standards, including soundproofing adjacent to airports, within the airport influence area." (Italics added.) We *692 decline to construe this tiny phrase as stripping the County of its power to deny an airport's CUP renewal, particularly since other provisions of the SAA expressly authorize counties to override the ALUC's determination of what constitutes consistency with the SAA. (§ 21676; fn. 5, ante.) Rather, it appears clear that the SAA's provisions regarding land use contemplate cooperation between an ALUC and a municipality concerning the growth and development of airports, where the municipality wants to keep the airport. The SAA does not require the municipality to keep the airport.
The Airport cites the SAA provisions stating the Department has the power to adopt noise standards for airports operating under a state permit "to an extent not prohibited by federal law" (§ 21669), and statewide uniformity is not required and "the maximum amount of local control and enforcement shall be permitted" (§ 21669.2, subd. (a)), and "[i]t shall be the function of the county wherein an airport is situated to enforce the noise regulations established by the department" (§ 21669.4, subd. (b)). None of this suggests the SAA is meant to protect airports from closure.
The Airport distinguishes Stagg v. Municipal Court (1969) 2 Cal.App.3d 318 [82 Cal.Rptr. 578], which held the SAA did not preempt a city ordinance prohibiting jet aircraft takeoffs from a city-owned airport during certain nighttime hours. Stagg said: "[T]here is no specific state legislation on the subject of noise abatement; the ordinance does not conflict with existing legislation in the general field of aviation; there has been no express declaration of legislative intent which would preclude local regulations in the field, or any general plan or scheme which is so comprehensive that an intent to occupy the field may be implied. [Citation.]" (2 Cal.App.3d at p. 323.) The Airport notes Stagg dealt with a city-owned airport, not a privately owned airport. The Airport says Stagg predated the SAA provisions on noise abatement and the statutory amendments addressing noise effectively invalidated Stagg's preemption analysis. We do not consider Stagg critical to our disposition, but it supports our conclusion that the SAA does not restrict the County's constitutional police powers unless it does so with some reasonable measure of specificity.
The Airport says we must look at the SAA as a whole. (O'Connell v. City of Stockton, supra, 41 Cal.4th 1061.) However, looking at the SAA as a whole, we do not see protection for airports against closure resulting from local land use zoning decisions.
The Airport cites Desert Turf Club v. Board of Supervisors (1956) 141 Cal.App.2d 446 [296 P.2d 882], which held the state had occupied the entire field of horse racing, precluding a county from banning horse racing in the entire county on moral grounds. However, the county in this case is not *693 banning airports from the entire county. Moreover, Desert Turf Club recognized the county could properly adopt zoning restrictions excluding horse racing tracks from portions of the county where such exclusion was reasonable. (Id. at p. 452.) The Airport's assertion that closure of airports would not be a "proper" zoning restriction begs the question and does not afford a basis for reversal of the judgment.
The Airport says the state permit is a "site" permit (Bakman v. Department of Transportation (1979) 99 Cal.App.3d 665 [160 Cal.Rptr. 583], citing Cal. Code Regs., tit. 21, §§ 3525-3541), which the County has no authority to revoke. However, the County has not purported to revoke the state permit.
The Airport presents us with an extensive discussion of legislative history of the SAA. We consider legislative history only if an ambiguity exists in the statutes. (Allen v. Sully-Miller Contracting Co. (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].) We see no ambiguity in the SAA. We recognize the SAA's express provisions about local powers could arguably be interpreted to exclude any powers not expressly listed. Thus, for example, the SAA states it "shall not be construed as limiting any power of the state or a political subdivision to regulate airport hazards by zoning." (§ 21005.) The Airport argues this provision would not have been necessary had the SAA not preempted regulation of airports by local entities. Additionally, the SAA allows counties (with a two-thirds vote) to override airport commissions on questions of whether local plans and airport land use plans are consistent. (§ 21676; fn. 5, ante.) We do not view these statutes as implying the SAA restricts any local powers not expressly stated. Airport hazards (unlike local land use zoning) are within the express jurisdiction of the Department under the SAA, and therefore it makes sense for the SAA to specify it does not limit local power. Inclusion of the override power in the SAA was necessary in order to specify the requirement of the two-thirds vote. Thus, the provisions expressing local power do not support a conclusion that unexpressed powers have been obliterated. The Airport fails to show any ambiguity in the SAA.
(13) Though not cited by the Airport, we note section 21674.7, which tells commissions to use an Airport Land Use Planning Handbook in formulating plans, states in a recently added subdivision (b): "It is the intent of the Legislature to discourage incompatible land uses near existing airports. Therefore, prior to granting permits for the renovation or remodeling of an existing building, [etc.], . . . local agencies shall be guided by the height, use, noise, safety, and density criteria that are compatible with airport operations. . . . [However, t]his subdivision does not limit the authority of local agencies to overrule commission actions or recommendations pursuant to Sections 21676, 21676.5, or 21677." While this provision reflects an intent to *694 discourage incompatible land uses near existing airports, it does not require existing airports to keep existing.
The Airport talks about the SAA's requirements that county general plans be consistent with ALUCP's. However, the Airport fails to show any inconsistency between the County's general plan and the ALUCP. Indeed, the Airport acknowledges the County's general plan and the East Elk Grove Specific Plan are consistent with the ALUCP. The record shows the County plans to change its general plan and request a commensurate change in the ALUCP to delete reference to the airport. However, that has not yet been done, and that action is not before us. We reject any implication that the presence of the airport on the current county and commission plans compels the County to allow continued operation of the airport.
The Airport argues that, before 1982, the SAA simply allowed local agencies to overrule commission decisions by a supermajority vote (former § 21676),[11] but the Legislature "took that last vestige of power away from local agencies" by adding the requirement in 1982 that the local agency must find its action is consistent with the SAA's purposes. This argument is unconvincing, because the 1982 amendment retained local power.
(14) We do see some indications that perhaps the SAA might be viewed as having an intent to impose some restriction on a county's authority to deny a CUP renewal for continuing operation of an airport. Thus, section 21675.1, subdivision (b), says that, until a commission adopts an ALUCP, "a city or county shall first submit all actions, regulations, and permits within the vicinity of a public airport to the commission for review and approval. Before the commission approves or disapproves any actions, regulations, or permits, the commission shall give public notice in the same manner as the city or county is required to give . . . ." However, if the commission disapproves an action, regulation, or permit, the county can overrule the commission by a two-thirds vote if the county finds the action, regulation, or permit is consistent with the purposes of the land use compatibility plan (§ 21675.1, subd. (d)), which are "to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around [public-use] airports to the extent that these areas are not already devoted to incompatible uses." (§ 21670, subd. (a)(2).) Once the *695 commission adopts an ALUCP, the general plan and any specific plan must be consistent with the ALUCP. (Gov. Code, § 65302.3.)
Thus, these provisions show the County does not have unfettered discretion over its permits. It is arguable whether the "permits" contemplated by these provisions refer to permits other than a county permit for airport operation, which may be assumed as a given. The SAA does not expressly address CUP denials which might lead to closure of airports. However, the SAA may be viewed as restricting development around airports, which may imply an intent to restrict local action that would lead to closure of airports. The California Supreme Court recently said in dictum that ALUCP's may "make it more difficult for local agencies to change their policies in the future to permit increased development within [a compatibility zone]. (See Gov. Code, § 65302.3, subd. (a) [fn. 6, ante].)" (Muzzy Ranch Co. v. Solano County Airport Land Use Com. (2007) 41 Cal.4th 372, 389 [60 Cal.Rptr.3d 247, 160 P.3d 116] (Muzzy Ranch) [ALUCP was a project under CEQA but CEQA review was not necessary because ALUCP was consistent with general plan and zoning which had already undergone CEQA review].) The California Supreme Court also said that, under the SAA, "an airport land use compatibility plan can operate like a multijurisdictional general plan to trump the land use planning authority that affected jurisdictions might otherwise exercise through general and specific plans or zoning." (Muzzy Ranch, supra, 41 Cal.4th at pp. 384-385.)
However, if the Legislature wants to strip counties of their powers to deny CUP renewals, the Legislature must do so in a clear way, so that such a conclusion can be reached by reference to the SAA itself, rather than a circuitous exploration of underlying legislative history and interpretation of the SAA's purposes.
The Airport quotes from Muzzy Ranch, supra, 41 Cal.4th at page 384, that even if a local government invokes the override provision, the SAA still controls (because the local entity must find its plan is consistent with the SAA). According to the Airport, it is thus indisputable that land use decisions in areas falling under an ALUCP must be consistent with the SAA's clearly stated purpose to protect the orderly expansion of airports rather than their involuntary closure. However, we have explained the SAA does not protect airports against closure.
Even if we were to conclude that an ambiguity in the SAA justifies resort to legislative history, the Airport fails to show grounds for reversal. The Airport cites comments from a Joint Interim Committee on Aviation in 1947, proposing the Legislature should protect not only property owners around airports but also operation of airports themselves. However, the Airport fails *696 to show this "proposal" made its way into the SAA. The Airport cites comments from the Director of the State Department of Aeronautics, presented to the Assembly Commerce and Public Utilities Committee in 1969, which proposed that ALUC's be given the power to regulate land use in the airport environment. However, the concern expressed in that document was unchecked expansion of airports, i.e., the development of "airport cities" permitted to grow without benefit of comprehensive planning. The document also noted that airports had been encouraged to expand "perhaps much more than originally anticipated."
The Airport suggests the resulting amendment to the SAA in 1970 deleted the prior provision that ALUC's could "make recommendations for the use of the land surrounding airports" (former § 21674, subd. (2); Stats. 1967, ch. 852, § 1, pp. 2288, 2290). However, the 1970 amendment did not alter this language. (Stats. 1970, ch. 1182, § 4, p. 2089.) The 1970 amendment did add section 21675, stating each ALUC "shall formulate a comprehensive land use plan that will provide for the orderly growth of each public airport and the area surrounding the airport . . . and will safeguard the general welfare of the inhabitants within the vicinity of the airport and the public in general. . . . In formulating a land use plan, the commission may . . . specify use of land . . . within the planning area." (Former § 21675; Stats. 1970, ch. 1182, § 5, p. 2090.) The 1970 amendment also gave local entities the power to overrule the commission by a four-fifths vote (later amended to two-thirds). (§ 21676; Stats. 1970, ch. 1182, § 6, p. 2090.)
However, although the Legislature gave ALUC's overlapping authority with local entities over protection of the general public in the orderly growth of airports, still nothing in the SAA protected airports from closure.
The Airport contends subsequent amendments to the SAA added provisions evincing a legislative intent to protect airports from closure. We have already explained that none of the SAA provisions warrants a conclusion that the SAA prevents the County from denying a CUP renewal that will result in closure of the airport. It is not enough, as suggested by the Airport, that the SAA does not expressly authorize local entities to deny CUP's for airports; that authority is conferred by the California Constitution.
(15) The Airport argues the Education Code recognizes the need to protect airports, because Education Code section 17215 says the Department must make a recommendation as to suitability of any school site selection within two miles of an airport, and no state funds can be expended if the Department does not approve the site. The Education Code does not protect airports from closure, nor does it compel a conclusion that the SAA protects airports from closure.
*697 We conclude the County's decision to deny the Airport's CUP renewal was not preempted by or contrary to the SAA. We need not discuss other arguments, e.g., the Airport's challenge to other reasons given by the trial court for its decision that there was no preemption.

III. CEQA

The Airport next contends the County's action violated CEQA because (1) the closure of the airport was a "project" under CEQA and not exempt from environmental consideration, and (2) the airport closure is likely to cause significant environmental impacts. We agree with the first point, that this case involves a CEQA project, and the County violated CEQA by failing to conduct an initial study. We therefore need not address the second point.
(16) CEQA requires environmental analysis of "projects" that may have environmental impacts. (Pub. Resources Code, § 21080.) A "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is . . . [¶] . . . [a]n activity directly undertaken by any public agency" or "[a]n activity that involves the issuance to a person of a . . . permit . . . by one or more public agencies." (Pub. Resources Code, § 21065, subds. (a), (c), italics added.) Under the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)), "project" means "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, [and involves issuance of a permit] . . . ." (Guidelines, § 15378, subd. (a).)
If the activity constitutes a CEQA "project," the public agency "shall conduct an initial study to determine if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).) If the agency determines there is no substantial evidence of a significant effect on the environment, the agency may issue a negative declaration. (Guidelines, § 15063, subd. (b)(2).) Otherwise, further environmental review is required. (Guidelines, § 15063, subd. (b)(1).)
"Where the facts in the record are undisputed, the court decides as a matter of law whether the challenged activity falls within CEQA's definition of a project. [Citations.]" (San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist. (2006) 139 Cal.App.4th 1356, 1377 [44 Cal.Rptr.3d 128] (San Lorenzo).) Our review is de novo. (Muzzy Ranch, supra, 41 Cal.4th at p. 382; Association for a Cleaner Environment v. Yosemite Community College Dist. (2004) 116 Cal.App.4th 629, 637 [10 Cal.Rptr.3d 560] (ACE).)
Muzzy Ranch, supra, 41 Cal.4th at pages 388-389, held adoption of an ALUCP was a project under CEQA but was exempt from CEQA review *698 under the "commonsense" exemption, because the plan was consistent with the general plan and zoning, which had already undergone CEQA review. Here, there has been no CEQA review regarding closure of the airport, and the County does not invoke Muzzy Ranch.
The County maintains there was no CEQA "project" because the board of supervisors merely denied a CUP renewal, and Guidelines, section 15270 states, "CEQA does not apply to projects which a public agency rejects or disapproves."
However, this case does not involve mere denial of a project, but denial of a CUP renewal that would indisputably result in closure of an airport, which the County intended to begin to enforce within 180 days, with transfer of pilots to other airports.
(17) A CEQA "project" means "the whole of an action" having the potential for physical change in the environment. (Guidelines, § 15378, subd. (a).)
(18) Public agency action resulting in closure of facilities may implicate CEQA. For example, ACE, supra, 116 Cal.App.4th 629, held that closure and removal of a community college's shooting range, and the attendant cleanup activity and transfer of classes to another range, were all part of a single, coordinated endeavor constituting a CEQA project requiring an initial study. The college district and its board argued there was no CEQA project because the board had not yet taken action to demolish the range but merely decided to close the range and clean up lead contamination. (116 Cal.App.4th at pp. 638-639.) The appellate court rejected the argument, noting evidence of the board's intent to remove the shooting range and develop nearby land. (Ibid.)
Similarly, closure of two schools requiring transfer of students to other schools has been held to constitute a CEQA "project" (though exempt on other grounds). (San Lorenzo, supra, 139 Cal.App.4th 1356, 1376, 1380.) The possibility that a school closure may have an environmental impact cannot be rejected categorically, and the transfer of students may pose some possibility of increased traffic congestion and attendant environmental effects. (Id. at pp. 1379-1380.)
We recognize these cases are distinguishable because they involved publicly owned schools, and here we deal with a privately owned airport. Nevertheless, a CEQA "project" is an activity which may cause a physical change in the environment and which is "[a]n activity directly undertaken by any public agency" or "[a]n activity that involves the issuance to a person of a . . . permit . . . by one or more public agencies." (Pub. Resources Code, § 21065, subds. (a), (c).)
*699 Here, the County's action in denying the permit has the undisputed practical effect of closing the airport. At the board of supervisors hearing, the County expressed its intent to enforce its zoning code and begin phasing out airport operations within 180 days. At this point, it is not known whether the buildings on the airport property can be adapted to other uses (though we do see indications in the record of an expectation that buildings might have to be removed). Even if it is not yet known what will happen to the airport facilities (hangars, paved runways, etc.), it is known and intended by the County that the pilots who currently use the airport will have to transfer to other airports. There was a discussion at the board of supervisors hearing about where the 60 or so pilots would go.[12] The chief operating officer of the Sacramento County Airport System discussed accommodations available at nearby airports, many of which would fall within operational limits that had already been subjected to environmental review. The Airport argued the transfer would result in increased road traffic on an ongoing basis.
We conclude the County's plan to enforce its zoning code, by ensuring the airport closure and transfer of pilots to other airports, are part of "the whole of [the] action" of the CUP denial, and the whole of the action has the potential for physical change in the environment. (Guidelines, § 15378, subd. (a).) Accordingly, the County's action constitutes a CEQA "project" requiring preparation of an initial study.
We do not suggest the airport closure will have significant adverse environmental impacts, nor do we suggest that an environmental impact report must be prepared. We merely hold the County has skipped an essential step in the implementation of its decision to close the airport and transfer its operations to other facilities. Before proceeding, the County must conduct an initial study under CEQA. The result of the initial study is not our concern. Neither is the wisdom of the decision to close the airport. We require only that the County comply with the mandates of CEQA. We need not address the parties' other CEQA arguments, e.g., whether closure of the airport will have significant adverse environmental impacts.

IV., V.[*]
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION
Insofar as the judgment denies appellants' claims under the State Aeronautics Act, the judgment is affirmed. Insofar as the judgment denies appellants' *700 claim under the California Environmental Quality Act, the judgment is reversed, and the matter is remanded to the trial court with directions to grant appellants' petition for a writ of mandate directing respondents to undertake an initial environmental study of the project. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)
Nicholson, J., and Cantil-Sakauye, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts IV. and V. of the Discussion.
[1] Undesignated statutory references are to the Public Utilities Code.
[2] Section 21666 states the Department shall issue the permit if it is satisfied the site meets or exceeds the Department's minimum airport standards; safe air traffic patterns have been established; the advantages to the public in selection of the site of a proposed new airport or a proposed airport expansion outweigh the disadvantages to the environment, etc.
[3] Although the state permit, like the CUP, is also subject to conditions, we use "CUP" in this opinion to refer to the County CUP.
[4] Section 21674 provides: "The commission has the following powers and duties, subject to the limitations upon its jurisdiction set forth in Section 21676: [¶] (a) To assist local agencies in ensuring compatible land uses in the vicinity of all new airports and in the vicinity of existing airports to the extent that the land in the vicinity of those airports is not already devoted to incompatible uses. [¶] (b) To coordinate planning at the state, regional, and local levels so as to provide for the orderly development of air transportation, while at the same time protecting the public health, safety, and welfare. [¶] (c) To prepare and adopt an airport land use compatibility plan pursuant to Section 21675. [¶] (d) To review the plans, regulations, and other actions of local agencies and airport operators pursuant to Section 21676. [¶] (e) The powers of the commission shall in no way be construed to give the commission jurisdiction over the operation of any airport. [¶] (f) In order to carry out its responsibilities, the commission may adopt rules and regulations consistent with this article."
[5] Under section 21676, each local agency whose general plan includes areas covered by an ALUC plan had to submit its plan to the ALUC by 1983 and continues to be required to submit proposed amendments of its plan to the commission. If the commission determines the plan or proposed change is inconsistent with the ALUC plan, the local agency may, after a public hearing, "overrule the commission by a two-thirds vote of its governing body if it makes specific findings that the proposed action is consistent with the purposes of [the SAA]." (§ 21676, subds. (b), (c); see id., subd. (a).)
[6] Government Code section 65302.3 provides in part: "(a) The general plan, and any applicable specific plan prepared pursuant to Article 8 (commencing with Section 65450) [Specific Plans], shall be consistent with the plan adopted or amended pursuant to Section 21675 . . . . [¶] . . . [¶] (c) If the legislative body does not concur with any provision of the plan required under Section 21675 . . ., it may satisfy the provisions of this section by adopting findings pursuant to Section 21676 . . . ."
[7] The trial court found distinguishable a case, cited by the Airport, which departed from the general rule and held a business owner had a fundamental vested right to renewal of a CUP. (Goat Hill Tavern v. City of Costa Mesa (1992) 6 Cal.App.4th 1519 [8 Cal.Rptr.2d 385].) Although we see some similarities between this case and Goat Hill Tavern, we need not address the matter because the Airport does not mention the case in its appellate briefs and does not develop any argument that the trial court applied the wrong standard.
[8] Government Code section 65850, subdivisions (a) and (c)(4), provide that a county's legislative body may adopt ordinances that "[r]egulate the use of buildings, structures, and land as between industry, business, residences, open space, including agriculture, recreation, enjoyment of scenic beauty, use of natural resources, and other purposes," and regulate the "intensity of land use."
[9] Government Code section 65800 provides that the Legislature, in enacting state zoning laws governing local zoning ordinances, has declared its "intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters."
[10] Contrary to the Airport's assertion at oral argument, this limitation on power does not apply only to municipal airports.
[11] As indicated (fn. 5, ante), under section 21676, each local agency with a general plan that includes areas covered by an ALUC plan had to submit its plan to the ALUC by 1983 and continues to be required to submit proposed amendments of its plan to the commission. If the commission determines the plan or proposed change is inconsistent with the ALUC plan, the local agency may, after a public hearing, "overrule the commission by a two-thirds vote of its governing body if it makes the specific findings that the proposed action is consistent with the purposes of [the SAA]." (§ 21676, subds. (b), (c); see id., subd. (a).)
[12] The Airport says 60 pilots hangar their aircraft at the airport, though we see some indication in the record that there may be 71 aircraft.
[*] See footnote, ante, page 671.